**DISTRICT OF COLUMBIA, Appellant,**

v.

**CATHOLIC UNIVERSITY OF AMERICA, Appellee.**

No. 11580.

District of Columbia Court of Appeals.

Argued Nov. 17, 1977.

Decided Jan. 17, 1979.

Richard G. Amato, Asst. Corp. Counsel, Washington, D.C., with whom John R. Risher, Jr., Corp. Counsel, Washington, D.C., at the time the case was briefed and argued, Louis P. Robbins, Principal Asst. Corp. Counsel, and Henry E. Wixon, Asst. Corp. Counsel, Washington, D.C., were on the brief, for appellant.

John L. Hamilton, Washington, D.C., for appellee.

Before YEAGLEY, MACK and FERREN, Associate Judges.

MACK, Associate Judge:

This appeal comes to us from the Tax Division of the Superior Court. The sole question presented is whether real property located on Lot 804, Square 3894 (Campus School) and Parcel 135/70 (Brady Hall) owned by appellee, Catholic University, is entitled to tax exempt status for the fiscal years 1975 and 1976 as buildings "belonging to and operated by" a university within the meaning of D.C. Code 1973, § 47–801a(j).[1] The trial court found that Campus School was so exempt for both years, and that Brady Hall was exempt at the rates of ninety percent and ninety-nine percent for the fiscal years 1975 and 1976 respectively. We affirm.

---

1. D.C. Code 1973, § 47–801a(j) reads as follows:

The real property exempt from taxation in the District of Columbia shall be the following and none other:

\* \* \* \* \* \*

(j) Buildings belonging to and operated by schools, colleges, or universities which are not organized or operated for private gain, and which embrace the generally recognized relationship of teacher and student.

The essential facts found by the trial court will be subdivided for purposes of clarity into separate sections pertaining to Campus School and Brady Hall. Initially, it should be noted that the trial court found that the appellee was a nonprofit corporation and school that embraced the generally recognized relationship of teacher and student. The taxable status of real property in the District of Columbia is determined by the use of that property on July 1 of the fiscal year involved.[2]

## CAMPUS SCHOOL

The taxes in controversy are real property taxes assessed against Campus School for the fiscal year 1975 in the amount of $4,231.48 and for the fiscal year 1976 in the amount of $4,240.76. The only tax which has been paid is the fiscal year tax for 1975.

Prior to 1969, the property was used and operated as an elementary school by teacher trainees who were students of the appellee. In 1969, the property was leased to a nonprofit educational institution (Campus School) which abandoned the premises in June of 1974. Subsequent to June of 1974 and up until the date of trial on October 29, 1975, the appellee used the Campus School as a storage facility for school and office supplies.[3] The supplies were formerly stored in a facility known as Butler Hall and were removed from Butler Hall because it was in need of repair.

The Campus School has 13,500 square feet of floor space consisting of three floors. The first and second floors contain classrooms and offices which have not been used since June of 1974. One-half of the basement space which is one-sixth of the total building space was used for storage. The trial court, in finding total exemption status, rejected appellant's argument that the nonuse of five-sixths of this building was significant under the specific facts.

**2.** *See Bethel Pentecostal Tabernacle, Inc. v. District of Columbia*, D.C.Mun.App., 106 A.2d 143, 145 (1954).

**3.** The District's Property Assessment Division initially advised appellee that both properties

## BRADY HALL

The taxes in controversy are real property taxes assessed for the fiscal year 1975 in the amount of $5,439.69 and for fiscal year 1976 in the amount of $5,361.44.

Brady Hall is a two-story residential building with a full basement. Prior to 1970, Brady Hall had been used and operated by appellee as a residence hall. Thereafter, and at the date of trial, appellee leased approximately eighty percent of the floor space to Gallaudet College for the operation of the Model Secondary School for the Deaf. Gallaudet used two floors as a residence for students in the Model School. The Model School was operated by Gallaudet under an agreement with the Secretary of Health, Education and Welfare and was not operated for private gain. A portion of the basement or approximately ten percent of Brady Hall was rented to the American Language Academy from September 1973 until September of 1975. Since September of 1975 the Academy had moved its classes from Brady Hall and had maintained only two offices in the facility. The Academy is a profitmaking educational institution that is involved in assisting foreign students, who have been accepted as students in American schools, in learning the English language. The Academy paid the appellee rent in the amount of $13,600 for each school year until September of 1975 and then paid $3,000 a year. The appellee realized a profit of $700 a year in September of 1975 and $300 a year thereafter. The remaining space in Brady Hall was used by appellee for storage which encompassed approximately ten percent of the space prior to September of 1975 and nineteen percent of the space up until trial. On these facts the trial court, questioning only that portion of the property used by the Academy for private gain, used its authority to prorate the exemption. *See* D.C. Code 1973, § 47–801a(j).

would be returned to the tax rolls effective July 1, 1972 for the reason that they "were no longer being used for the purposes for which the exemption was granted."

## DISCUSSION

The basic issue for resolution is whether a concurrence of ownership and use of property is required for exemption under section 801a(j). The able trial court, dealing with what was purported to be full briefing and argument on the part of the parties, noted that appellant had cited no authority to support its position that property must be owned and used by the same entity. Drawing upon cases interpreting analogous sections,[4] the court ruled as a matter of law that section 801a(j) did not require a concurrence of ownership and use.

For the first time during oral argument in this court, however, appellant has advanced the existence of a regulation specifically addressed to this issue. Thus, Regulation No. 74-35 promulgated by the District of Columbia City Council and becoming law on December 12, 1974 states in pertinent part:[5]

REGULATION ESTABLISHING ASSESSMENT AND REASSESSMENT REGULATIONS OF REAL PROPERTY AND RELATED MATTERS

\* \*, \* \* \* \*

*Section* 133. ELIGIBILITY FOR EXEMPTION

Real property must meet all of the following conditions to be eligible for exemption from taxation.

(a) Title to the real property for which exemption is sought must be recorded in the name of the organization, or institution requesting exemption from taxation on or prior to the effective date of the exemption; and

(b) *Must be occupied by and used by the organization or institution seeking exemption* for at least one of the types or categories of exempt purposes as defined in the real estate tax exemption act of December 24, 1974 (Section 47-801, D.C. Code). [Emphasis supplied.]

On supplemental briefing appellee has challenged generally the validity of section 133(b) of the regulation as being inconsistent with section 47-801(a) of the Code, relying primarily on the case law in existence at the time of the promulgation of the regulation. However disposed we may be to uphold the validity of section 133(b) of the regulation, we cannot do so if it is inconsistent with the enabling statute as interpreted and the legislative history thereof.

Although appellant has proffered little in the way of definitive argument supporting the validity of the regulation, we are told that it was drafted pursuant to authority granted by the Title IV of Pub. L. No. 93-407, 88 Stat. 1051 (codified at D.C. Code 1975 Supp., § 47-641 *et seq.*) known as the District of Columbia Real Property Tax Revision Act of 1974, effective September 3, 1974. The preamble to the regulation so states that Pub. L. No. 93-407 requires the Mayor and the Council[6] to act together to promulgate assessment and reassessment regulations for real property and related matters within ninety days of the Act's enactment, citing sections 421(c), 421(e) and 421(f) of the Act, and reciting that the Mayor and the Council, after publication and public hearings, had so acted.

■ Subsections (c), (e) and (f) of section 421 of the Act, 88 Stat. 1053, 1054 (codified in D.C. Code 1975 Supp., § 47-641(c), (e) and (f)) read as follows:

---

4. *See District of Columbia v. Maryland Synod of the Lutheran Church*, D.C.App., 307 A.2d 735 (1973) (§ 47-801a(n)); *Trustees of St. Paul Methodist Episcopal Church South v. District of Columbia*, 94 U.S.App.D.C. 78, 82-83, 212 F.2d 244, 248-49 (1954) (§ 47-801a(h)); *Catholic Home for Aged Ladies, Inc. v. District of Columbia*, 82 U.S.App.D.C. 195, 196, 161 F.2d 901, 902 (1947) (§ 47-801a(h)); *Calvary Baptist Church Ext. Ass'n v. District of Columbia*, 81 U.S.App.D.C. 330, 331, 158 F.2d 327, 328 (1946) (§ 47-801a(n)).

5. We are reprinting as an appendix a copy of the entire regulation. It is published in the District of Columbia Register of January 20, 1975.

6. The Act speaks in terms of the "Commissioner" and the "Council" of the District of Columbia "as established under Reorganization Plan Numbered 3 of 1967"—subsequently abolished as of noon January 2, 1975 by § 1-131, and replaced by the Council and the Mayor of the District of Columbia respectively, as provided by §§ 1-141 and 1-161.

(c) The Council may adopt regulations concerning the assessment and reassessment of real property and matters relating thereto *which shall be consistent with the provisions of this chapter and other applicable provisions of law.*

.    .    .    .    .

(e) The Commissioner shall submit to the Council, within forty-five days after September 3, 1974, proposed regulations to be adopted by the Council pursuant to subsection (c).

(f) Consistent with the provisions of this chapter and regulations of the Council, the Commissioner shall promulgate necessary regulations and administrative orders. If the Council shall not have adopted regulations concerning assessment pursuant to subsection (c) within ninety days after September 3, 1974, the Commissioner shall promulgate such regulations. [Emphasis supplied.]

An examination of these subsections of the Act leaves no doubt that the District of Columbia was acting pursuant to express authority and in timely and appropriate fashion in enacting the regulation. The critical issue, however, is whether the regulation as promulgated exceeds that express authority or whether the regulation is consistent with the provisions of the Act and other applicable provisions of law.

In the broad context, the regulation clearly falls within the spirit of the Pub. L. No. 93–407. The congressional purpose of the legislation was to revise the tax law so as to achieve, among other objectives, the comparability of tax effort between the District of Columbia and cities of comparable size. In so doing Congress placed broad powers of assessment, notification, rate establishment and collection with the Mayor and the Council. (*See generally* § 47–621 *et seq.*) The authority to issue regulations accompanied this delegation, including even the authority to establish penalties for violations of the Act or regulations issued pursuant thereto. (*See* § 47–661.)

Regulation 74–35 tracks the provisions of the statute in detailing *inter alia* the mechanics and time frames for setting the tax rate, the factors to be used in establishing assessed values, and the procedures for payment of taxes, notification of delinquency, applying for exemption, and reporting. *See generally* Appendix. The setting of criteria necessary to qualify for an exemption (section 133) is an integral part of the picture. The Mayor and the Council, in so doing, were acting pursuant to their mandate to administer the revised tax law. As such, their interpretation is entitled to be given great weight. *See Watergate Improvement Associates v. Public Service Commission,* D.C.App., 326 A.2d 778, 785 (1974); *Thompson v. Clifford,* 132 U.S.App.D.C. 351, 363, 408 F.2d 154, 166 (1968).

■ However, it is axiomatic that a regulation be consistent with the statute under which it was promulgated. *See, e. g., Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 80 L.Ed. 528 (1936); *McCeney v. District of Columbia,* 97 U.S.App.D.C. 282, 230 F.2d 832 (1956); *Thompson v. Amalgamated Casualty Insurance Co.,* 92 U.S.App.D.C. 307, 314–15, 207 F.2d 214, 220–21 (1953). In the area of administrative law, ". . . an agency's interpretation of a statute should be followed when it 'is reasonable and *does not contravene the language or legislative history of the statute.*'" *Tenants of 3039 Q Street, N.W. v. District of Columbia Rental Accommodations Commission,* D.C.App., 391 A.2d 785, 787 (1978), quoting from *Coakley v. Police & Firemen's Retirement & Relief Board,* D.C.App., 370 A.2d 1345, 1349 (1977). [Emphasis supplied.]

Comparing the literal language of D.C. Code 1973, § 47–801a(j) with section 133(b) of the regulation, we cannot say that the regulation is necessarily inconsistent with the statute. But the appellee has persuasively argued that this section of the regulation must fall as being inconsistent with the provision of § 47–801a(j) as it had been interpreted by case law of the federal circuit court prior to February 1, 1971 which we are bound to follow, absent en banc reconsideration. *See M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971). The primary

**920**

cases relied upon are *Catholic Home for Aged Ladies, Inc. v. District of Columbia,* 82 U.S.App.D.C. 195, 196, 161 F.2d 901, 902 (1947) and *Trustees of St. Paul Methodist Episcopal Church South v. District of Columbia,* 94 U.S.App.D.C. 78, 83 n.6, 212 F.2d 244, 249 n.6 (1954). Appellee contends that these decisions necessitate our concluding that section 47–801a(j) does not permit a regulation (such as section 133(b) of Regulation 74–35) requiring concurrence of ownership and use in one institution.

In *Catholic Home for Aged Ladies, Inc. v. District of Columbia, supra,* arising under an analogous provision of the statute (§ 47–801a(h)),[7] the property sought to be taxed belonged to an originally incorporated charity and was operated by its auxiliary charity. The federal circuit held that the facts literally fell within the statutory language of section 47–801a(h), viz—property belonging to and operated by institutions not organized or operated for private gain. However, the federal court went further to state that the requirement of concurrence of ownership and use in one institution was "an erroneous construction of the Congressional language and in the very teeth of its purpose and intent." *Catholic Home for Aged Ladies, Inc. v. District of Columbia, supra,* 82 U.S.App.D.C. at 196, 161 F.2d at 902. It concluded after examining the legislative history of section 47–801a(h) that there was nothing to support the requirement of concurrent ownership and use but rather an indication that the use of the property was the controlling factor. *Id.* *Catholic Home* was reaffirmed in *Trustees of St. Paul Methodist Episcopal Church South v. District of Columbia, supra,* to illustrate the distinction between section 47–801a(h) and subsection (m) where Con-

gress clearly said concurrence of ownership and use is essential to the exemption of a church building. *Trustees of St. Paul Methodist Episcopal Church South v. District of Columbia, supra,* 94 U.S.App.D.C. at 83 n.6, 212 F.2d at 249 n.6.

Our own examination of the legislative history reveals that the District of Columbia Real Property Tax Revision Act was part of a larger bill, H.R. 15842, 93 Cong., 2nd Sess. (1974) and that Congress' motivation in passing that bill was two-fold: 1) to increase compensation for District of Columbia policemen, firemen and teachers and 2) to revise and reform the real property tax administration in the District of Columbia to assure a more equitable sharing of the tax burden while at the same time raising sufficient local revenues to finance salary increases. 120 Cong.Rec. 29,366–67 (1974) (remarks of Rep. Diggs, Chairman of the House District Committee); 120 Cong. Rec. 28,722 (1974) (remarks of Sen. Eagleton). H.R. 15842 was considered interim legislation to provide for proper salaries to policemen, firemen and teachers in the period between when the District of Columbia Self-Government and Governmental Reorganization Act (the Home Rule Act)[8] was passed and its effective date. 120 Cong. Rec. 25,528 (1974).

The legislative history of the larger bill also reveals that on March 15, 1973, Mr. Diggs introduced H.R. 5689,[9] a bill to revise the real and personal property tax exemption laws of the District of Columbia. Title I, Sections 105(B)(3)(a) and (5) of H.R. 5689 proposed in pertinent part that the following property in the District of Columbia should be exempt from taxation:

**7.** The relevant portion of D.C. Code 1973, § 47–801a(h) exempts:

Buildings belonging to and operated by institutions which are not organized or operated for private gain, which are used for purposes of public charity principally in the District of Columbia. . . .

**8.** D.C. Code 1975 Supp. II, § 1–121 *et seq.* District of Columbia Self-Government and Governmental Reorganization Act, Pub.L. No. 93–198, 87 Stat. 774 (1973). Title IV dealing with

the legislative powers of the D.C. Council did not become effective until January 2, 1975, twenty-one days after the promulgation of Section 771(c) of the Home Rule Act (codified in D.C.Code 1975 Supp. II, § 1–144).

**9.** Real Property Tax Revision: Hearing Before the Subcommittee on Revenue and Financial Affairs of the Committee on D.C. House of Representatives on H.R. 5689, 93d Cong., 2d Sess. 23 (1974).

(3)(a) Buildings owned by and actually occupied and used exclusively for purposes of public charity by an organization which is not organized or operated for commercial purposes, or for private gain.

. . .

\* \* \* \* \* \*

(5) Buildings owned by and actually occupied and used exclusively for educational purposes by an incorporated school, college, or university which (a) is not organized or operated for commercial purposes or for private gain, and (b) has educational entrance requirements or entrance examinations, and (c) has persons employed for full-time teachings, and (d) embraces the generally recognized relationship of teacher and student, and (e) conforms with all applicable standards as may be determined by the Board of Education of the District of Columbia.

By its express language, subsection (5) would have required concurrent ownership and use to achieve tax exempt status for educational buildings. But this bill died in committee and Congress passed the District of Columbia Real Property Tax Revision Act which left section 47–801a substantially intact except for adding (in irrelevant part) subsection (s). We cannot conclude that Congress was unaware of the interpretation given section 47–801a(h) by the federal circuit cases and that Congress' decision not to revise these sections is insignificant in ascertaining congressional intent. *Cf. National Automatic Laundry & Cleaning Council v. Shultz,* 143 U.S.App.D.C. 274, 291, 443 F.2d 689, 706 (1971) (positive action of Congress rejecting limiting amendments). We are not persuaded that Con-

gress considered concurrence of ownership and use necessary to the exemption of buildings "which embrace the generally recognized relationship of teacher and student" under section 47–801a(j).

Therefore we must hold section 133(b) of the Regulation No. 74–35 invalid as being, at the time it was promulgated, inconsistent with section 47–801a(j) as it had been interpreted and with the legislative history of the enabling statute. *See Tenants of 3039 Q Street, N.W. v. District of Columbia Rental Accommodations Commission, supra* at 787; *Coakley v. Police & Firemen's Retirement & Relief Board, supra* at 1349. *See also* section 421(c) of the Act (D.C. Code 1975 Supp., § 47–641(c)) *supra* at 7.

We wish to emphasize that in declining to uphold the validity of section 133(b) of the regulation, we are not addressing the authority of the D.C. Council to enact legislation or regulations pursuant to the Home Rule Act with respect to any matter covered by the District of Columbia Real Property Tax Revision Act, including regulations at variance with the circuit court interpretation of § 47–801a(j) as to the requirement of concurrent ownership and use.[10]

Our conclusion that section 133(b) of the regulation is invalid does not necessitate our disturbing the finding of the trial court as to Campus Hall or Brady Hall. With respect to Campus Hall, Catholic University, at all times in question, was the owner and sole user of this building. We do not agree with appellant that the University must lose five-sixths of its exemption because only one-sixth of the building was actually used for storage. Nothing in the regulation nor the statute addresses itself

10. As we have noted, the District of Columbia Real Property Tax Revision Act is interim legislation which moved the District of Columbia closer to the primary goal of the Home Rule Act: to relieve Congress of the burden of legislating upon essentially local matters to the greatest extent possible, consistent with the constitutional mandate. D.C. Code 1978 Supp., § 1–121(a). *See McIntosh v. Washington,* D.C. App., 395 A.2d 744 (at 753). In this regard section 501 of the tax revision act, set out in the note to D.C. Code 1975 Supp., § 47–621, specifically provides:

Notwithstanding any other provision of law, or any rule of law, nothing in this Act [for classification of Act to the Code, see Tables] shall be construed as limiting the authority of the Council of the District of Columbia to enact any act, resolution, or regulation, after January 2, 1975, pursuant to the District of Columbia Self-Government and Governmental Reorganization Act with respect to any matter covered by this Act.

to partial and incidental or temporary non-use by the owner-occupier. In the absence of precedent, the reasoning of the trial court is persuasive:

> The crux is not the incidental use or nonuse of the property but what is its primary use. . . .

> \* \* \* \* \* \*

> A school the size of Catholic University must have some flexibility in its operation and its exempt status should not be disturbed merely because it elects, for a given period, not to use a given classroom, or portion of a dormitory, or other building . . . ..

With respect to Brady Hall, Catholic University was not the owner and sole user of the building for the fiscal years 1975 and 1976. However this lack of concurrence of ownership and use did not operate to deny Brady Hall tax exempt status under section 47–801a(j). We therefore conclude that Brady Hall is exempt from tax liability at the rate of ninety percent and ninety-nine percent for the fiscal years 1975 and 1976 respectively, and Campus Hall is entitled to full tax exempt status for fiscal years 1975 and 1976.

*Affirmed.*

## APPENDIX

Regulation No. 74–35

Enactment Date—December 12, 1974

[SEAL]

REGULATION

*of the*

DISTRICT OF COLUMBIA

TITLE REGULATION ESTABLISHING ASSESSMENT AND REASSESSMENT REGULATIONS OF REAL PROPERTY AND RELATED MATTERS

Chairman John A. Nevius Presents the following regulation:

WHEREAS, Public Law 93–407, signed by President Ford on September 3, 1974, requires the Mayor and the Council to act together to promulgate assessment and reassessment regulations for real property and related matters within ninety days of enactment; and

WHEREAS, the Mayor has submitted to the Council his proposed regulations, in accordance with provisions 421(c), 421(e) and 421(f) of Public Law 93–407, within the required forty-five days from enactment; and

WHEREAS, the Committee of the Whole of the D.C. Council published the Mayor's proposal on October 29, 1974 in the D.C. Register as required by the D.C. Administrative Procedures Act and held, after due notice, public hearings on November 12, 1974.

NOW, THEREFORE, BE IT ENACTED by the District of Columbia Council that:

### Section 100. SCOPE OF REGULATIONS

These regulations concern the assessment and reassessment of real property and matters relating thereto consistent with the provisions of the District of Columbia Real Property Tax Revision Act of 1974 and other applicable provisions of law.

### Section 101. DEFINITIONS

(a) *Act.* The word "Act" means the District of Columbia Real Property Tax Revision Act of 1974 (Public Law 93–407).

(b) *Arms Length Transaction.* The term "arms length transaction" means the sale of property which was exposed for sale in the open market under prevailing market conditions with a reasonable time for the seller to find a purchaser and which took place between parties who had knowledge of the uses to which the property could be put, both seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other.

(c) *Assess.* Except where specifically provided otherwise, the word "assess" means to value real property for tax purposes.

(d) *Assessment.* Except where specifically provided otherwise, the word "assessment" means a real property valuation established by the Commissioner for tax purposes against which the rate of tax is applied to arrive at the tax liability.

(e) *Assessment Areas.* The term "assessment areas" means the geographic areas within the District which have been designated by the Commissioner as areas for assessment purposes.

(f) *Cities of Comparable Size.* The term "cities of comparable size" means at least the 30 largest cities in the United States as listed in the United States Bureau of the Census population studies.

(g) *Commissioner.* The word "Commissioner" means the Commissioner of the District of Columbia established under Reorganization Plan Numbered 3 of 1967, or his authorized representative.

(h) *Council.* The word "Council" means the District of Columbia Council established under Reorganization Plan Numbered 3 of 1967.

(i) *Erected.* The word "erected" means completely built and finished.

(j) *Estimated Market Value.* The term "estimated market value" means 100 per centum of the most probable price rounded to the nearest one hundred dollars at which a particular piece of real property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would be expected to transfer under prevailing market conditions between parties who have knowledge of the uses to which the real property may be put, both . seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other.

(k) *Real Property.* The term "real property" means real estate identified by plat on the records of the District of Columbia Surveyor according to lot and square together with improvements thereon.

(*l*) *Roofed and Under Roof.* The word "roofed" and the phrase "under roof" mean the stage of completion of a structure where the main roof and the roofs of any structures thereon are in place.

(m) *Tax Year.* The term "tax year" as used in these regulations shall have the same meaning as that term is given in the Act.

(n) *Vicinity of the District and Washington Metropolitan Area.* The terms "vicinity of the District" and "Washington Metropolitan Area" mean Prince Georges and Montgomery Counties in the State of Maryland and Arlington and Fairfax Counties, and the city of Alexandria and the city of Fairfax in the State of Virginia.

*Section 102.* REAL PROPERTY TAX RATE

(a) *Commissioner.* (1) On or before July 15 of each year the Commissioner shall submit to the Council, in accordance with the provisions of the Act, a proposed real property tax rate for the tax year. The Commissioner may extend for up to thirty days the period for submitting the tax rate.

(2) At the time the Commissioner submits to the Council the proposed tax rate under paragraph (1) of this sub-section, he shall also submit, in addition to other information required by the Act, the real property tax rate (rounded to the nearest penny) calculated to yield in the tax year the same amount of revenue (exclusive of the revenue attributable to new construction) as was raised by that tax at the rate applicable during the year preceding the tax year.

(3) When the rounding of the tax rate in accordance with sub-section (2) of this section does not yield the same amount of revenue as was obtained from the previous year's levy, the tax rate shall be increased to the nearest penny which will yield at least the same amount of such revenue.

(b) *Establishment of Rate.* (1) The Council, after public hearing, shall establish each year a tax rate within thirty days after receipt of the proposed rate submitted by the Commissioner.

(2) The Council may, by resolution, extend the time for setting the rate of taxation, except that if the Council does make such an extension, it must establish the tax rate for that tax year.

(c) *Tax Rate and Burden Studies.* (1) On or before June 30, 1975 and each succeeding year thereafter, the Commission shall compile and publish studies based on the best

information available regarding the relative amount of tax burdens for all major taxes compared with those in surrounding jurisdictions in the Washington metropolitan area and other cities of comparable size.

(2) In establishing the rate each year the Council shall consider the tax burdens studies made pursuant to paragraph (1) of this sub-section and any other comparisons it deems advisable to make.

(3) Major taxes for purposes of tax burden studies of individuals shall include, but not necessarily be limited to, individual income taxes, real property taxes, sales taxes and motor vehicles taxes.

(4) The tax impact study on businesses shall be an annual study which shall present business tax rate comparisons. Major taxes for purposes of comparing tax rates on business shall include, but not necessarily be limited to, real property taxes, business income taxes, personal property taxes and major excise taxes.

(5) For purposes of Section 413 of the Act major classes of property shall mean, with respect to taxable properties, at least the following two classes: (1) residential real property and; (2) commercial real property and, with respect to exempt property, at least the following three classes: (1) United States government owned properties; (2) District government owned properties, and, (3) all properties other than United States Government and District of Columbia government owned properties.

Residential property shall include the following: (1) vacant land zoned for residential use; (2) residential garages, and, (3) all improved property used primarily for residential dwelling purposes, including detached dwellings, semi-detached dwelling, row dwellings, flats, residential condominiums, cooperatives and apartments.

Commercial property shall include all taxable real property other than residential property.

### Section 103. ASSESSMENT–SALES RATIO STUDIES

(a) The Commissioner shall annually prepare and publish an assessment-sales ratio study for major classes of property for the entire District and for major classes of property within each assessment area for which sufficient data is available as determined by the Commissioner.

(b) Results of the study shall be published in the D.C. Register and made available to the press.

### Section 104. ASSESSMENT

(a) All real property shall be assessed no less frequently than once every two years, and as soon as practicable such assessment shall be made annually except that for fiscal year 1976, and for each fiscal year thereafter, all real property shall be assessed on an annual basis.

(b) For purposes of this section, the terms "assess" and "assessed" do not include changes in assessed value resulting from new construction, additions to existing structures, damages to or destruction of property, and any other similar changes specified in Sections 47–710 and 711 of the D.C. Code.

### Section 105. ASSESSED VALUE

(a) The assessed value of all real property shall be the proposed estimated market value established on or before January 1 of the year preceding the tax year, as determined by the Commissioner, except that the assessed value of new structures and other improvements added to the assessment roll as of July 1 "each year shall be the estimated market value as of that July 1" and the assessed value of new structures and improvements added to the assessment roll as of January 1 each year shall be the estimated market value as of January 1 of the tax year.

(b) The assessed value of a property shall be established on the basis of the most current, accurate, and conclusive evidence of market value available at the time the assessed value is determined.

### Section 106. INSPECTION OF PROPERTIES

The Commissioner is authorized to conduct exterior and interior inspection of

properties when, in his judgment, such inspection is necessary in establishing assessed values.

*Section 107.* ASSESSMENT AREAS

(a) The Commissioner may designate geographic assessment areas for purposes of analyzing market values.

The boundaries of the assessment areas may be changed as necessary in order to reflect changing economic or other conditions which have a bearing on the market value of properties. Whenever the Commissioner deems it desirable, for the purpose of analyzing market values, to analyze values by types of property as, for example, all motels or all hotels, rather than only those types of properties located in a geographical area, he may do so.

(b) Descriptions of the boundaries of the areas or maps showing the boundaries shall be made available to the public during normal business hours.

*Section 108.* FACTORS AND APPROACHES WHICH MAY BE USED IN ESTABLISHING ASSESSED VALUES

(a) In determining the assessed value of property the Commissioner shall take into account all available information which may have a bearing on the market value of the real property including but not limited to government imposed restrictions, sales information for similar types of real property, mortgage or other financial considerations, replacement costs less accrued depreciation because of age and condition, income earning potential (if any), zoning, the highest and best use to which the property can be put, and the present use and condition of the property and its location.

(b) In considering the above factors, the Commissioner may apply when appropriate one or more of the following generally recognized approaches to value or any other method he deems necessary to arrive at estimated market values:

(1) *The comparable sales approach to value.* The price or prices at which reasonably comparable properties have recently sold.

Sales which represent arms length transactions between buyer and seller shall be used in analyzing market values.

Sales which do not represent arms length transactions shall either be disregarded or adjusted for differences.

Sales comparisons may be made by property type within an assessment area.

If sufficient sales data for an assessment area are not available, sales data from other similar areas may be used.

(2) *The replacement cost approach.* The cost of replacing property with new property of similar utility at present price levels, less the extent to which the value has been reduced by depreciation because of age, condition, obsolescence, or other factors.

The replacement cost of a property may be estimated either by (1) adjusting the property's original cost for price level changes, or (2) applying current prices to the property's labor and materials components and taking into account any other costs typically incurred in bringing the property to a finished state.

Replacement cost shall be reduced by the amount of the estimated loss of value because of age, condition or other factors.

(3) *The income approach to value.* The amount that investors would be willing to pay to receive the income that the property could be expected to yield.

An indication of the value of an income producing property may be estimated by computing the present worth of a future income stream.

The income stream is capitalized or converted into an indicated value. The amount to be capitalized may be either the gross or net return.

*Section 109.* INFORMATION TO BE PROVIDED BY PROPERTY OWNERS

(a) Whenever the Commissioner shall determine that in order to carry out his functions and responsibilities under the Act, facts in the possession of a property owner

should be made available to the Commissioner he may, by written notice to the property owner, require such owner to provide to him, on the form prescribed by the Commissioner, such facts as, in the discretion of the Commissioner, will assist him in determining the estimate of the market value of the property. In the absence of any extension of time granted by the Commissioner all such forms shall be filed with the Commissioner within 30 days from the time of the mailing of the written notice to the property owner.

(b) Any information obtained from a property owner pursuant to this section concerning any income derived from investment or income-producing real property shall be handled in the same confidential manner as is provided in paragraphs (a), (b), (c), and (d) of Section 47–1564(c) of the District of Columbia Code.

(c) Any violation of the provisions of subsection (b) of this section shall be a misdemeanor and shall be punishable by a fine not exceeding $1,000.00 or imprisonment for six months, or both, in the discretion of the Court. All prosecutions under this section shall be brought in the Superior Court of the District of Columbia on information by the Corporation Council of the District of Columbia or any of his assistants in the name of the District of Columbia.

### Section 110. AVAILABILITY OF RECORDS

(a) The preliminary assessment roll, as prescribed by Section 424(a) of the Act, all maps, field books, assessment sales-ratio studies, copies of any documents received from the Office of the Surveyor and plats shall be available for public inspection during normal business hours.

(b) Records of individual properties including any notes and memorandums and any statement indicating the basis upon which the real estate has been assessed shall be open for inspection by the taxpayer or his designated agent during normal business hours, except that the taxpayer may be required to give to the Commissioner at least 24 hours notice in advance of his intention to inspect records.

(c) Copies of all material shall be furnished to any person upon request for a charge not to exceed the cost of producing such copies.

### Section 111. PUBLICATION OF ASSESSMENT LISTING

(a) The Commissioner shall publish annually a listing of assessed values of all properties by lot and square and address where available.

(b) The Commissioner shall publish such listing in sufficient quantity to allow for distribution to the Municipal Center, the District Building, the main public library and to a public library branch in each of the eight wards of the city. Notice of publication and of the location of the listing shall be published in the D.C. Register.

(c) Additional copies of the listing shall be made available to the public upon request at the lowest charge which would cover the cost of reproducing the listing.

### Section 112. NOTIFICATION TO TAXPAYER

(a) The Commissioner shall notify each owner of taxable property, by mail, of the assessment of his real property for the next fiscal year.

(b) Notices shall be mailed as soon as possible after January 1, but not later than March 1 of each year.

(c) Unless otherwise specified, any notice, bill or statement required by these regulations or other applicable provision of law to be served upon the property owner shall be deemed to be served when mailed by first class mail to the last known address of the property owner as recorded in the real estate assessment records of the District.

(d) The notice or accompanying statement shall include all of the information required by Section 425 of the Act.

### Section 113. INFORMATION FROM OTHER DISTRICT OF COLUMBIA AGENCIES

(a) Within five days from the date of the filing of a Deed Recordation tax return the

Recorder of Deeds shall transmit such return to the Department of Finance and Revenue, D.C.

(b) The Department of Economic Development, D.C., shall forward to the Department of Finance and Revenue, D.C., a copy of each building permit relating to structural, electrical, or plumbing changes within 5 days from the date the permit is approved.

(c) The Zoning Commission of the District of Columbia shall provide to the Department of Finance and Revenue, D.C., a detailed listing of all zoning and land use changes within 10 days from the date of the adoption of such change.

(d) The Office of the Surveyor, D.C., shall provide the Department of Finance and Revenue, D.C., with copies of all plats recorded in the subdivision books, plats recorded in connection with condominiums, and other plats recorded with respect to record lots within 10 days after they are recorded with the Office of the Surveyor, D.C.

(e) The Board of Zoning Adjustments of the District of Columbia shall submit to the Department of Finance and Revenue all approved zoning variances within 15 days from the date of the adoption of such variances.

(f) The Fire Marshal of the Fire Department of the District of Columbia shall on or before the 10th day of each month provide the Department of Finance and Revenue, D.C., with a listing of each real property damaged or destroyed by fire in the District of Columbia.

(g) The Commissioner, upon request, may extend the time for the filing of any documents required to be filed with the Department of Finance and Revenue, D.C., under this section.

*Section 114.* COMPENSATION OF MEMBERS OF THE BOARD OF EQUALIZATION AND REVIEW

Each member of the Board of Equalization and Review shall receive compensation at a rate of one-two thousandth of the annual salary of the first step of Grade 15 of the General Schedule in Section 5332 of Title 5 of the United States Code for each hour such member is engaged in the actual performance of duties vested in the Board, except that the chairman shall receive compensation at the rate of one-two thousandth of the second step of Grade 15 of the General Schedule in Section 5332 of Title 5 of the United States Code for each hour he is engaged in the actual performance of duties vested in the Board.

*Section 115.* ESTABLISHING MARKET VALUES

(a) When in accordance with Section 426(f) of the Act the Board raises or lowers the estimated market value of any real property which it finds to be more than 5 per centum above or below the estimated market value contained in the preliminary assessment roll, it shall change the value to an amount equal to the Board's estimate of market value of such property.

(b) The Board shall not consider average ratio studies to be a basis for changes in market value of any property or properties if it finds that other factors such as physical inspections of properties, analysis of sales data other than that contained in the average ratio study, construction cost data or data relating to the potential income, if any, of the property require a variance from the average ratio studies.

*Section 116.* PAYMENT OF REAL PROPERTY TAX

(a) Real property taxes are payable semi-annually in the months of September and March, provided that if the Council does not set the tax rate by August 15 of the tax year the first-half bill shall be due and payable thirty (30) days after the date of the mailing of the tax bills, in which event penalty and interest shall not begin to accrue until after the expiration of the period for payment.

(b) The tax bill shall identify the property by parcel or lot and by square number, state the amount of tax due and the manner in which such tax is payable according to law, and state whether there are any delinquent taxes on such property.

### Section 117. DELINQUENT NOTICES

(a) Prior to July 1 of each year, notices of delinquent tax shall be mailed to the record owner or his designated representative as to real property upon which any tax for the current fiscal year is unpaid after March 31.

(b) Prior to December 1 of each year, a second notice of delinquent tax shall be mailed to the record owner or his designated representative as to real property upon which any amount of tax for the fiscal year ending on the preceding June 30 has not been paid. The notice provided for in this subsection shall state that the real property involved will be sold at public auction at the next scheduled tax sale if the taxes due and owing, including any penalty and interest thereon, are not paid prior to such sale.

### Section 118. DELINQUENT TAX LIST

(a) There shall be prepared annually a list of all real property in the District upon which taxes were in arrears on the first day of July.

### Section 119. ADVERTISING OF DELINQUENT TAX LIST AND NOTICE OF SALE

(a) A list of all taxes, charges, and assessments on real property in the District of Columbia subject to taxation on which said taxes, charges, and assessments have been levied and are in arrears on the first day of July of each year and a notice of the sale of such property shall be advertised once in two major daily newspapers published in the District of Columbia at least three weeks prior to the day fixed for such sale.

(b) The notice of sale shall set forth the types of delinquent taxes, charges, and assessments for which the property is being sold. The notice shall also state that the property will be sold at public auction to the highest bidder thereon, and shall recite the date, time, and place of said sale.

(c) Each item on the delinquent tax list shall contain the name of the owner of the property, a description of the delinquent property by parcel, square, and lot numbers, and shall indicate the total amount of taxes, penalties, interest, and charges due.

### Section 120. DELETIONS

A real property shall be deleted from the delinquent tax list upon payment at any time up to the time of the tax sale of all taxes, penalties, interest and other charges due.

### Section 121. DEPOSIT REQUIRED

Every purchaser of property at a tax sale shall be required to deposit with the District at the time of sale not less than 20% of the purchase price as a guarantee of the payment of the total amount required to be paid by the purchaser.

### Section 122. PUBLIC AUCTION

(a) All properties remaining on the delinquent tax list shall be sold at public auction beginning at the time and place specified in the notice provided for in section 106.5 of these regulations.

(b) Properties to be sold shall be announced by lot, square and parcel numbers.

(c) A bidder at the tax sale shall bid by stating his name or, if he is acting for another, the name of his principal, and his opening bid shall be at least equal to the total amount of tax, penalty, interest and other charges due the District.

(d) In the event no bid is received for a property which is at least equal to the total amount of tax, penalty, interest and other charges due, the property shall be deemed bid off and sold to the District of Columbia.

### Section 123. FORFEITURE OF DEPOSIT

The deposit of any purchaser at a tax sale who fails to pay the full amount of his bid price, including surplus, within five days after the last day of sale shall be forfeited to the District.

### Section 124. CERTIFICATE OF SALE

A Certificate of Sale shall be issued to the purchaser of each property sold at the tax sale.

### Section 125. RECORDING OF SALE

Within twenty (20) days, exclusive of Saturdays, Sundays and legal holidays, after the last day of the tax sale, a written report shall be filed with the Recorder of Deeds describing each property sold, except those bid off to the District, to whom assessed, the tax and penalty and other charges due, the name of the purchaser, the sale price, the date on which the property was sold, the costs of sale involved, and the surplus bid for the property, if any.

### Section 126. NOTIFICATION OF REDEMPTION PERIOD

Not less than thirty (30) days prior to the expiration date of the two year redemption period, the record owner shall be notified, by certified or registered mail, of the final date by which he must redeem his property.

### Section 127. DEEDS TO THE DISTRICT

Upon issuance of a deed to the District of Columbia pursuant to Section 437 of the Act, all outstanding taxes, penalties and interest, and charges of any kind which may be due as to the property described in the deed, shall be expunged.

### Section 128. TAX DEFERRAL

(a) Taxpayers eligible under Section 435 of the Act may defer payment of any real property tax owed in excess of 110 per centum of his immediate preceding year's real property tax liability.

(b) Taxpayers eligible under Section 436 of the Act may defer payment of any real property tax owed which is attributable to an increase in assessed value of more than 25 per cent over the assessment of the immediately previous fiscal year.

(c) The taxpayer must have owned the residential real property for which the tax deferral is claimed for at least 60 consecutive months prior to July 1 of the tax year in which the deferral is requested.

### Section 129. COMPUTATION OF DEFERRAL AMOUNTS

(a) Increases in assessed valuation resulting from improvements made since the last previous assessment may not be included in the calculation of the increase in real estate tax payable for purposes of Sections 435 and 436 of the Act. The amount of increased value resulting from improvements to the property shall be provided by the Commissioner upon request.

(b) Any increase in tax attributable to increases in the tax rate shall not be included in the computation of deferral amount in the case of eligible taxpayers with household adjusted gross incomes in excess of $20,000.

### Section 130. REQUESTS FOR DEFERRAL

(a) Written requests for deferral must be filed at the same time that the first half tax bills are due and payable. Reasonable extensions of time may be granted by the Commissioner upon written request and for good cause shown.

(b) Adjustments in tax liability resulting from tax deferrals shall be made on the second half tax bill. No adjustments shall be made on the first half tax bill.

(c) A taxpayer who elects to pay both his first half and second half bills on or before the due date for the first half payment shall not deduct his claimed amount of deferral from the amount of tax due. The amount of deferral for which he is eligible will be refunded after review and approval of the request for deferral.

(d) Taxes deferred pursuant to Sections 435 and 436 of the Act shall bear interest compounded annually. The rate of interest applied in each year shall be the average Treasury bill rate for the twelve months preceding July 1 of the tax year in which the deferral is granted, as certified by the Secretary of the Treasury to the Commissioner.

### Section 131. COMBINED HOUSEHOLD ADJUSTED GROSS INCOME

(a) For purposes of the application of Sections 435 and 436 of the Act, the words

"combined household adjusted gross income" shall mean the adjusted gross incomes (for District income tax purposes) of all members of the taxpayer's family who resided in the residential real property during the previous calendar year.

### Section 132. TAX RELIEF FOR HISTORIC SITES

(a) The Joint Committee on Landmarks of the National Capital shall on or before December 15, 1975, provide the Commissioner with a listing of all buildings which they have designated historic landmarks, and shall notify the Commissioner on or before June 15 and December 15 of each succeeding year of any additions or deletions to such listing.

(b) In order to be eligible for tax relief provided by Section 432 of the Act, owners of buildings which have been designated historic landmarks by the Joint Committee on Landmarks of the National Capital shall enter into an agreement with the Commissioner for a period of not less than twenty years to use and maintain the building in a manner which will assure the continued maintenance and preservation of the building as an historic site.

(c) An eligible building whose owner has entered into an agreement with the Commissioner in accordance with sub-section (b) of this section shall, in addition to being assessed at full market value, be assessed, both as to land and improvements, as an historic site, which latter assessment, if it is less than the full market value determined without regard to the historic nature of the building, shall be the basis of tax liability to the District of Columbia.

(d) If the Commissioner determines that a building or any part thereof as to which an agreement has been entered into with the District in accordance with sub-section (b) of this section was not used and properly maintained in accordance with the agreement during all or any part of any fiscal year, such building, or part thereof, shall be assessed for such fiscal year, or part thereof, on the basis of full market value. The difference, if any, between the assessments made on the basis of full market value and the assessments primarily made on the basis of the current use of the land and improvements shall be the basis of tax liability for violation of the agreement. Any back taxes, plus interest at the prevailing United States Treasury rate of interest for the fiscal year or part thereof during which the terms of the agreement were not met, which may be due and owing shall be payable within sixty (60) days after the date of mailing by the Commissioner of a notice to the owner of the amount of taxes and interest due.

### Section 133. ELIGIBILITY FOR EXEMPTION

Real property must meet all of the following conditions to be eligible for exemption from taxation.

(a) Title to the real property for which exemption is sought must be recorded in the name of the organization, or institution requesting exemption from taxation on or prior to the effective date of the exemption; and

(b) Must be occupied by and used by the organization or institution seeking exemption for at least one of the types or categories of exempt purposes as defined in the real estate tax exemption act of December 24, 1942 (Section 47–301, D.C.Code).

### Section 134. APPLICATION FOR EXEMPTION

(a) Exemptions from taxation of real property must be by written application except for the following:

(1) Property owned by the United States Government;

(2) Property owned by the Government of the District of Columbia;

(3) Property owned by the Commonwealth of the Philippines and used for government purposes;

(4) Property owned by foreign governments not under a treaty agreement and used for legation purposes;

(5) Property specifically exempt by Acts of Congress.

(b)(1) All applications for an exemption of real property must be in writing and filed with the Commissioner.

(2) The following information must be included in the application for exemption:

a. Name of the applicant;

b. Location, square, and lot number of the real property involved;

c. Date real property was acquired;

d. Current and proposed future use of real property;

e. Description of the activities of the applicant;

f. Name, address, and telephone number of person to be contacted for an inspection of the real property;

g. Such other information as the Commissioner may require.

(c) *Action on Applications*

(1) Real properties for which an application for an exemption has been filed shall be physically inspected to verify and evaluate data in the application and results of the inspection will be recorded.

(2) Written notice of the granting or denial of an application for exemption shall be mailed to the applicant and shall cite the provision of law under which an exemption is granted, or the reason for its denial and the effective date of the exemption, if approved.

(3) If a request for an exemption is denied, the procedure for appeal will be included in the notice to the applicant for exemption.

### Section 135. TAXABLE OR EXEMPT STATUS

(a) Tax status of any real property on July 1 of any year will prevail for the respective properties for the entire fiscal year *except* for properties sold by the U.S. Government after July 1, in which case the property tax will be computed on a pro-rata basis beginning with the date of sale and will be payable by the property buyer.

(b) Requests for exemption from property tax if approved are effective on July 1 of the fiscal year for which the exemption is granted.

(c) Property, except for property sold by the United States, which loses its exempt status for any reason becomes taxable on July 1 following the date the exemption expires.

### Section 136. ANNUAL REPORT ON EXEMPT REAL PROPERTIES

(a) Every owner of real property exempt from taxation, except the United States Government, the District of Columbia Government, and foreign governments must furnish the Commissioner a report on or before March 1 of each year stating under oath the purpose for which the exempt property has been used during the preceding calendar year.

(b) Annually, on or before February 1, notice of the reporting requirement, together with a report form prescribed by the Commissioner, shall be mailed to each such owner of exempt property. Failure of the owner to receive the notice or report form shall not relieve the owner from compliance with the requirements of sub-section (a) of this section.

(c) A second notice will be mailed to each non-responding owner no later than ten (10) days prior to March 1 of each year restating the filing requirement. Failure of the owner to receive the notice or report form shall not relieve the owner from compliance with the requirements of sub-section (a) of this section.

### Section 137. EXTENSIONS OF TIME

For good cause shown, the Commissioner may extend the time for filing the annual report of an exempt organization for a period not to exceed thirty (30) days after March 1, providing such request for extension is filed prior to March 1.

### Section 138. ASSESSMENT OF UNRE-PORTED PROPERTIES

(a) If the report required to be filed by sub-section (a) of section 136 is not filed within the time provided therefor, or as

extended by the Commissioner, the property affected shall immediately be assessed and taxed but the tax assessed under this section shall be for a minimum period of thirty (30) days.

(b) A tax bill shall be mailed to the owner for each month or portion of a month that the report remains unfiled, together with interest thereon at the rate provided by law.

(c) Exempt properties upon which taxes are delinquent are subject to inclusion in the annual tax sale in the same manner as other delinquent properties.

### Section 139. REVIEW OF REPORTS

(a) Annual reports will be reviewed each year to determine eligibility for exemption for the ensuing fiscal year.

(b) The Commissioner may require the furnishing of additional information and may conduct a physical inspection of the property at his discretion.

(c) Any property no longer eligible for exemption shall be returned to a taxable status effective July 1 of the ensuing fiscal year and the owners so notified in writing.

(d) If after the filing of the annual report but prior to July 1 of any year it is determined by the Commissioner that the property is no longer entitled to be exempt from tax the exemption shall be terminated as of July 1.

### Section 140. EFFECTIVE DATE

Except as otherwise specifically provided in the Act or in these regulations, these regulations shall become effective immediately upon adoption by the Council.