The BOARD OF EQUALIZATION FOR the BOROUGH OF KETCHIKAN, Alaska, and the Assessor of the Borough of Ketchikan, Alaska, Michael Worley, Appellants,

v.

ALASKA NATIVE BROTHERHOOD AND SISTERHOOD, CAMP NO. 14, an unincorporated association; and Ketchikan Indian Corporation, a federally chartered organization, Appellees.

ALASKA NATIVE BROTHERHOOD AND SISTERHOOD, CAMP NO. 14, an unincorporated association; and Ketchikan Indian Corporation, a federally chartered organization, Cross-Appellants,

v.

The BOARD OF EQUALIZATION FOR the BOROUGH OF KETCHIKAN, Alaska, and the Assessor For the Borough of Ketchikan, Alaska, Michael Worley, Cross-Appellees.

Nos. 6453, 6565, 6492 and 6605.

Supreme Court of Alaska.

June 16, 1983.

Russell W. Walker, Mun. Atty., Ketchikan, for appellants and cross-appellees.

Robert G. Mullendore, Teresa V. Bigelow, Bennet A. McConaughy, Roberts & Shefelman, Anchorage, for appellees and cross-appellants.

Robert E. Price, Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for State of Alaska as amicus curiae.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## AMENDED OPINION

COMPTON, Justice.

The issue raised in this appeal is whether real property leased by the Ketchikan Indian Corporation ("KIC") from the Alaska Native Brotherhood and Sisterhood, Camp No. 14, ("ANB/ANS") is exempt under federal law from the property taxes assessed by the Borough of Ketchikan. The superior court ruled that it is exempt under 25 U.S.C. § 465 (1934). For the reasons set forth below, we conclude that this ruling is incorrect. KIC argues on cross-appeal that the superior court's decision should nonetheless be affirmed by this court on either of two bases: (1) the leased property is exempt from taxation because KIC holds and uses it in its sovereign capacity, or (2) the leased property is exempt from taxation because it is a federal instrumentality. The superior court specifically rejected this second argument, and we conclude that it was proper to do so. The court did not consider the argument that the property is exempt from taxation because it is held and

used by KIC in its sovereign capacity, even though this issue was raised by KIC. We reject this argument as well and thus conclude that the property leased by KIC is subject to local ad valorem taxes under the federal law. We therefore need not address the argument raised by the Board of Equalization for the Borough of Ketchikan ("the Board") that the superior court erred in ruling that KIC is entitled to costs and attorney's fees as the prevailing party.

## I. FACTUAL AND PROCEDURAL BACKGROUND

KIC was formed pursuant to 25 U.S.C. § 476, section 16 of the Indian Reorganization Act of 1934. It has a constitution, bylaws and a charter, each of which has been approved by the United States. In 1977, KIC leased a parcel of land located within the Borough of Ketchikan from the ANB/ANS. The lease is for a term of fifty years, with an option to renew for another fifty years. The rental paid by KIC is $25.00 per year. Using federal funds, KIC constructed a two-story building, called the "Native Center." At the end of the lease term, title to the building will revert to the ANB/ANS. KIC conducts various cultural, educational, vocational, health and community service programs at the Native Center.

Shortly after construction of the Native Center, KIC received a Real Property Assessment Notice from the Borough of Ketchikan. The Borough mistakenly believed that KIC was the fee owner of the property. The Borough subsequently directed the Assessment Notice to the ANB/ANS. The property was assessed as having a value of $406,050.00, of which $381,300.00 is attributable to the Native Center improvement. The record does not disclose the annual tax liability that is being challenged by KIC.

The ANB/ANS is apparently without funds to pay any taxes, and KIC contends that the tax liability therefore will fall upon it. KIC contends that it would "be forced to divert federal funds" designated for programs conducted at the Native Center to pay any taxes because it does not have other funds that can be used for the Native Center. This diversion of funds is permissible under federal law, but KIC believes it should not be required to do so.

The ANB/ANS and KIC appealed the assessment to the Board. The Board upheld the assessment. The ANB/ANS and KIC then appealed this decision to the superior court for a trial de novo pursuant to AS 29.53.140(f). The Board moved to have KIC dismissed from the action on the basis that it is not a proper party because it is the status of the property owner and not of the lessee that determines whether the property is exempt from taxation. The superior court denied this motion.

The Board and KIC then filed cross-motions for summary judgment. KIC sought a declaratory judgment that the property and all improvements located on it are exempt from local ad valorem taxes under both federal and state law. The ANB/ANS did not join in this motion. The Board sought a declaratory judgment that the property is not exempt from taxation. On October 23, 1981, the superior court issued a memorandum of decision and order, concluding that the property is exempt under federal law pursuant to 25 U.S.C. § 465. The Board moved to have this decision reconsidered, but its motion was denied. The court amended its order, however, to indicate that only the leasehold interest of KIC and the improvements on the property are exempt from taxation; the real property owned by the ANB/ANS is not exempt.

The Board appeals from the judgment entered against it. KIC has filed a cross-appeal to preserve for this court's consideration the alternative bases upon which it believes the superior court's judgment could be affirmed, i.e., the property is exempt from taxation either because KIC uses it in its sovereign capacity or because the property is a federal instrumentality. The ANB/ANS has joined in KIC's cross-appeal. The State of Alaska has filed a brief with this court as amicus curiae, in which it contends that the leased property is not exempt under federal law from ad valorem taxes.

## II. DISCUSSION

### A. Exemption under 25 U.S.C. § 465

The superior court ruled that under 25 U.S.C. § 465 the property leased by KIC is exempt from local ad valorem taxes. This section provides as follows:

> The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.
>
> . . . .
>
> *Title to any lands or rights acquired pursuant to sections 461, 462, 463, 464, 465, 466–470, 471–473, 474, 475, 476–478, and 479 of this title shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.*

Indian Reorganization Act § 5, 25 U.S.C. § 465 (1934) (emphasis added).

■ The Board does not dispute the superior court's holding that KIC's interest in the leased property is a "right acquired pursuant to sections 476 and 477" of the Indian Reorganization Act. The Board contends, however, that section 465 exempts lands or rights from state and local taxation *if and only if* title to the land or right is "taken in the name of the United States in trust for the Indians." We agree.

In ruling to the contrary, the superior court relied upon its interpretation of *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). As indicated by the superior court, the United States Supreme Court held in *Mescalero* that under 25 U.S.C. § 465 New Mexico could not impose a *compensating use tax* on personal property permanently attached to real property leased by the tribe from the United States government, even though the land was not technically acquired in trust

by the United States for the tribe. 411 U.S. at 158, 93 S.Ct. at 1275, 36 L.Ed.2d at 125. We agree with the Board, however, that this holding abrogates the prerequisite of title being taken in the name of the United States in trust for the Indians under only the most limited circumstances, which do not exist in this case.

In *Mescalero,* the Indian tribe operated a ski resort on land adjacent to the reservation. The tribe leased this land for thirty years from the United States Forest Service. The Supreme Court noted that the land was not technically acquired by the United States in trust for the tribe, "[b]ut, as the Solicitor General has pointed out, 'it would have been meaningless for the United States, which already had title to the forest, to convey title to itself for the use of the Tribe.' ... We think the lease arrangement here in question was sufficient to bring the Tribe's interest in the land within the immunity afforded by § 465." 411 U.S. at 155 n. 11, 93 S.Ct. at 1274 n. 11, 36 L.Ed.2d at 123 n. 11. These facts are readily distinguishable from the facts underlying this case. It would not have been meaningless for the United States, which did not have title to the leasehold interest of KIC, to have acquired title to the lease in trust for KIC. In *Mescalero,* the United States already owned the land leased to the tribe and the failure to convey title to itself in trust for the tribe was, as the Court stated, only "technical." In this case, no argument can be made that the nonparticipation of the United States in KIC's lease from the ANB/ANS was merely technical. The United States did not participate even indirectly; accordingly, the exception recognized in *Mescalero* cannot be extended to these facts.

■ There is no evidence that the United States Congress intended to permit an Indian tribe to unilaterally create a trust relationship between itself and the United States merely by purchasing land or entering into a lease in its capacity as a corporation under section 16 or 17 of the Indian Reorganization Act (25 U.S.C. §§ 476 and 477). The United States must be actively

involved in the creation of that relationship. This is evidenced by the federal regulations promulgated in 1980 under 25 U.S.C. § 465. In relevant part, 25 C.F.R. § 120a.3 (1981) states:

Land not held in trust or restricted status may only be acquired for an individual Indian or a tribe in trust status when such acquisition is authorized by an act of Congress. No acquisition of land in trust status, including a transfer of land already held in trust or restricted status, shall be valid unless the acquisition is approved by the Secretary.

25 C.F.R. § 120a.9 (1981) states:

An individual Indian or tribe desiring to acquire land in trust status shall file a written request for approval of such acquisition with the Secretary. The request need not be in any special form but shall set out the identity of the parties, a description of the land to be acquired, and other information which would show that the acquisition comes within the terms of this part.

It should be noted that 25 C.F.R. § 120a.2(g) (1981) defines "land" to mean "real property or any interest therein," which would include a leasehold interest such as that acquired by KIC. It is of some interest that 25 C.F.R. § 120a.10(e) specifically provides that "[i]n evaluating requests for the acquisition of land in trust status, the Secretary shall consider . . . the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls."

■ These regulations were not promulgated until 1980, three years after KIC entered into its lease with the ANB/ANS. Therefore, the failure of KIC to comply with the regulations is not meaningful in itself. The regulations, however, make it apparent that the property of an Indian tribe is not exempt from local ad valorem taxes under 25 U.S.C. § 465 unless the United States holds the title to the property in trust for the Indians and, furthermore, that the United States must actively approve the acquisition of land in trust status.

■ The United States did not approve the acquisition of KIC's leasehold in trust status and the United States does not hold title to the leasehold in trust for KIC. Accordingly, the property is not exempt from taxation under 25 U.S.C. § 465.[1]

In view of this conclusion, we need not determine the validity of the Board's contention that KIC's property could not be exempt under 25 U.S.C. § 465 pursuant to 25 C.F.R. § 120a.1, which states, in part, "These regulations do not cover the acquisition of land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or its members."[2]

*B. Exemption under Theory of Sovereign Capacity*

On cross-appeal, KIC contends that the judgment should be affirmed on either of two alternative bases. The first alternative basis proposed by KIC is that its leasehold

---

1. This conclusion is supported by the decision of the South Dakota Supreme Court in *Leading Fighter v. County of Gregory,* 89 S.D. 121, 230 N.W.2d 114 (S.D.), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 563, 46 L.Ed.2d 405 (1975), in which ad valorem taxes were upheld because the property had not been purchased in the name of the United States.

There are several reported decisions in which the tax exempt status of property under 25 U.S.C. § 465 was recognized because the land had been properly conveyed to the United States in trust for the tribe. *E.g., Chase v. McMasters,* 573 F.2d 1011, 1016 (8th Cir.1978); *City of Sault Ste. Marie, Michigan v. Andrus,* 458 F.Supp. 465, 473 (D.D.C.1978). These cases were decided prior to the promulgation of regulation 25 C.F.R. § 120a, and thus some

recognized procedure for transferring land to the United States in trust for Indian tribes existed prior to 1980, i.e., at the time KIC entered into its lease with the ANB/ANS.

2. KIC may even now request a transfer of its leasehold interest to the United States to be held in trust for it pursuant to 25 C.F.R. § 120.9. *See Chase v. McMasters,* 573 F.2d 1011, 1016 (8th Cir.1978) ("There is no prohibition against accomplishing the same result [obtaining tax-exempt status under 25 U.S.C. § 465] indirectly by conveyance of land already owned by an Indian to the United States in trust."). It would then be left to the Secretary of the Interior to approve or disapprove the request.

interest is exempt from taxation under federal law because it is held and used by KIC in its sovereign capacity.

KIC argues that it is the nature of the entity upon which the tax burden falls that determines whether a tax may be validly imposed. It contends that the burden of the property taxes will fall entirely upon it. It further contends that the programs it administers at the Native Center are governmental service programs administered by KIC "as a sovereign and because it is a sovereign." KIC thus concludes that the ad valorem taxes assessed by the Board are "a tax directly on the provision of governmental services, and as such constitute a substantial and improper interference with tribal autonomy." KIC urges that this conclusion is mandated by *Crow Tribe of Indians v. Montana*, 650 F.2d 1104 (9th Cir. 1981), which KIC contends stands for the proposition that any tax resulting in a substantial impact on a tribe's ability to provide governmental services to its people is invalid under federal law.

The state and the Board disagree with KIC's analysis for several reasons. First, the state and the Board correctly argue that KIC presented no evidence to the superior court that KIC is a tribe entitled to the benefits of this possible rule. We conclude, however, that it is not necessary to decide in this case whether KIC is an Indian tribe because the issue of exemption from taxes under federal law can be fully resolved by assuming *arguendo* that KIC is a tribe.

Second, the state and the Board contend that the taxes assessed by the Board are permissible because the legal incidence of

the tax falls upon the ANB/ANS, which is not a tax-exempt entity. This rule has been applied by some states, notably California,[3] to determine whether a property tax that burdens a local governmental entity is valid under state law, but never to determine whether a tax that arguably burdens an Indian tribe is valid under federal law. The United States Supreme Court and lower federal courts have repeatedly stated that a tax could be impermissible if it burdened an Indian tribe even though the legal incidence of the tax fell upon a non-Indian. *E.g., Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 155–59, 100 S.Ct. 2069, 2082–84, 65 L.Ed.2d 10, 30–32 (1980); *Crow Tribe of Indians v. Montana,* 650 F.2d at 1115–17. In two recent decisions the Supreme Court specifically held that the tax at issue was invalid because it burdened an Indian tribe even though the legal incidence of the tax fell upon a non-Indian. *Ramah Navajo School· Board v. Bureau of Revenue,* —— U.S. ——, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). We are thus precluded from applying the rule suggested by the state and the Board in this case.[4]

Third, the Board contends that the federal rule, that any tax substantially impinging upon a tribe's ability to provide governmental services to its members is invalid because it constitutes an impermissible interference with tribal autonomy, has been stated to apply only to the taxation of reservation or allotment property or property held in trust by the United States for an

**3.** *City of Palo Alto v. County of Santa Clara,* 5 Cal.App.3d 918, 85 Cal.Rptr. 544 (Cal.App. 1970); *Rothman v. County of Los Angeles,* 193 Cal.App.2d 522, 14 Cal.Rptr. 427 (Cal.App. 1961), and *Ohrbach's Inc. v. County of Los Angeles,* 190 Cal.App.2d 575, 12 Cal.Rptr. 132 (Cal.App.1961), cited by the Board, all stand for the proposition that when a tax-exempt entity leases property from an owner that is not tax-exempt, the owner must continue to pay the full property taxes assessed. The tax-exempt tenant in each of these cases, however, was a governmental subdivision and not an Indian tribe. Furthermore, not all jurisdictions abide by the "ownership" test; some rely upon "use"

as the test of exemption. Annot., 55 A.L.R.3d 430 (1974) ("Property Tax: Exemption of Property Leased by and Used for Purposes of Otherwise Tax-Exempt Body").

**4.** The only issue before this court is the validity of the ad valorem taxes under *federal* law. KIC initially argued that the taxes are invalid under state law as well, but this issue has been left by the superior court for determination "at a later time." The rule suggested by the state and the Board could be relevant if KIC pursues its argument that the taxes are invalid under state law.

Indian tribe. The Board notes that KIC's leasehold interest is not reservation or allotment property or property held in trust for KIC. The Board thus concludes that the rule is inapplicable to this case.

In *Mescalero Apache Tribe v. Jones,* 411 U.S. at 149, 93 S.Ct. at 1270–71, 36 L.Ed.2d at 119, the United States Supreme Court stated, "Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State. . . . That principle is as relevant to a State's tax laws as it is to state criminal laws . . . ." Felix Cohen's *Handbook of Federal Indian Law* states, "Outside Indian country under tribal jurisdiction, Indians are subject to state taxing jurisdiction in common with other persons, except where a more specific federal right preempts state law." F. Cohen, *Handbook of Federal Indian Law* 416 (1982) (footnote omitted). *Accord People of South Naknek v. Bristol Bay Borough,* 466 F.Supp. 870, 879 (D.Alaska 1979). Relying upon the above-cited federal authorities, the Board contends that even if KIC is assumed to be an Indian tribe, the property taxes are permissible because KIC is clearly not a *reservation* Indian tribe.

Cohen further states, however, "No instance has been found where a state attempted to tax the governmental activities of a tribe outside Indian country; it is likely that the federal guardianship of tribes would preclude a tax of that sort." F. Cohen, *Handbook of Federal Indian Law* at 417 (footnote omitted). We accordingly believe it would be useful to determine whether the property is exempt from taxation under the test enunciated in *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251, 254 (1959).

■ The *Williams v. Lee* test is whether or not the state action infringes on the right of reservation Indians to make their own laws and be ruled by them. 358 U.S. at 220, 79 S.Ct. at 270, 3 L.Ed.2d at 254. KIC argues that the ad valorem property taxes impermissibly interfere with its tribal autonomy because the economic burden of the tax will fall upon it and substantially impact its ability to provide governmental services to its members. This is so because, KIC claims, it will have to divert federal funds used for its programs to the payment of the taxes and KIC will then have to reduce its programs accordingly.

There is no evidence in the record before this court that the economic burden will in fact fall upon KIC and that burden is in fact "severe." Nonetheless, even assuming that both of these contentions are correct, the relevant authorities indicate that the tax is permissible. In *Washington v. Confederated Tribes,* the United States Supreme Court stated:

Washington does not infringe the right of reservation Indians to "make their own laws and be ruled by them," *Williams v. Lee,* . . . merely because the result of imposing its taxes will be to deprive the Tribes of receiving revenues which they are currently receiving. The principle of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other. . . . While the Tribes do have an interest in raising revenues for essential governmental programs, that interest is strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services. The State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services.

447 U.S. at 156–57, 100 S.Ct. at 2083, 65 L.Ed.2d at 31. Thus, the economic burden imposed by taxes "impermissibly infringes upon tribal autonomy" only when the tribe's interest in the revenue is at least as great as the local government's interest.

■ When the competing interests of KIC and the Borough of Ketchikan are

balanced, it is apparent that the Borough's assertion of taxing authority is reasonable. The taxes assessed against the property are non-discriminatory ad valorem property taxes. The revenues generated from the taxes will be used to provide police and fire protection to the premises, as well as to provide water, electrical and sewer services to the building. Like the state interest identified in *Washington,* Ketchikan has a strong interest in raising these revenues by taxing the property because they are for services that must be provided to the property. We believe that Ketchikan's interest in obtaining the revenues to provide these services from the beneficiaries of the services is sufficiently great to outweigh KIC's interest in retaining the revenues to provide governmental services to its members. We therefore conclude that, assuming KIC is an Indian tribe and further assuming that the *Williams v. Lee* test applies even though KIC is obviously not a reservation Indian tribe, the Borough's non-discriminatory ad valorem property taxes are valid because, even if the economic burden of the taxes falls upon KIC, when Ketchikan's and KIC's interests are balanced it is apparent that Ketchikan's assertion of taxing authority is reasonable.[5]

### C. *Exemption under Theory of Federal Instrumentality*

KIC argues that even if we reject its first "alternative" argument, the judgment should nonetheless be affirmed on the basis that its leased property is exempt from taxation because it is a federal instrumentality. The superior court summarily rejected this argument, finding it to be "the least deserving of extended discussion." We agree. The disfavor into which the doctrine of federal instrumentalities has fallen is amply demonstrated by the Court's comments in *Mescalero:*

> The intergovernmental immunity doctrine was once much in vogue in a variety of contexts and, with respect to Indian affairs, was consistently held to bar a state tax on the lessees of, or the product or income from, restricted lands of tribes or individual Indians. The theory was that a federal instrumentality was involved and that the tax would interfere with the Government's realizing the maximum return for its wards. This approach did not survive; its rise and decline in Indian affairs is described in *Helvering v. Mountain Producers Corp.,* 303 U.S. 376 [58 S.Ct. 623], 82 L.Ed. 907 ... (1938); *Oklahoma Tax Comm'n v. United States,* 319 U.S. 598 [63 S.Ct. 1284], 87 L.Ed. 1612 ... (1943); and *Oklahoma Tax Comm'n v. Texas Co.,* 336 U.S. 342 [69 S.Ct. 561], 93 L.Ed. 721 ... (1949), where the Court cut to the bone the proposition that restricted Indian lands and the proceeds from them were—as a matter of constitutional law—automatically exempt from state taxation.

411 U.S. at 150, 93 S.Ct. at 1271, 36 L.Ed.2d at 120. The Court quoted from its earlier decision in *Choctaw, Oklahoma & Gulf R.*

---

5. KIC suggests that our analysis is inappropriate in view of the recent opinion issued by the United States Supreme Court in *Ramah Navajo School Board v. Bureau of Revenue,* —— U.S. ——, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982). To the contrary, we conclude that our analysis is in complete accordance with *Ramah.* In that case, the Supreme Court struck down a state gross receipts tax imposed on a non-Indian subcontractor of a school building constructed for the Navajo tribe on their reservation. The Court held that the tax was implicitly preempted by the comprehensive federal regulatory scheme governing the construction of autonomous Indian educational facilities. The court noted that the tax served only to generate revenue for the state, which was not providing any correlative services to the tribe. The Court's

opinion specifically indicates: "In this case, the State does not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying this tax." —— U.S. at ——, 102 S.Ct. at 3401, 73 L.Ed.2d at 1183.

In the case before us, however, the taxes assessed by Ketchikan are in return for the governmental functions it provides to the property leased by KIC. Accordingly, the tax is not impermissible, nor is it preempted by federal regulations because it is apparent that when the "relevant state, federal, and tribal interests," *Ramah,* —— U.S. at ——, 102 S.Ct. at 3399, 73 L.Ed.2d at 1180, are examined and balanced, Ketchikan's assertion of taxing authority is reasonable.

*Co. v. Mackey,* 256 U.S. 531, 536, 41 S.Ct. 582, 583, 65 L.Ed. 1076, 1080 (1921), stating, "[T]he 'mere fact that property is used, among others, by the United States as an instrument for effecting its purpose does not relieve it from state taxation.'" 411 U.S. at 151, 93 S.Ct. at 1271, 36 L.Ed.2d at 121. The Court then concluded, "We accordingly decline the invitation to resurrect the expansive version of the intergovernmental-immunity doctrine that has been so consistently rejected in modern times." *Id.* at 154, 93 S.Ct. at 1273, 36 L.Ed.2d at 123. In *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 474 n. 13, 96 S.Ct. 1634, 1641 n. 13, 48 L.Ed.2d 96, 107 n. 13 (1976), the United States Supreme Court indicated that *Mescalero* "effectively eliminated [the federal instrumentality] doctrine as a basis for immunizing Indians from state taxation."

■ The Supreme Court has indicated that whether or not an entity should be exempt from taxation because it is a federal instrumentality is essentially a policy decision for the legislature and not a constitutional issue for the courts. *Oklahoma Tax Commission v. Texas Co.,* 336 U.S. 342, 365–66, 69 S.Ct. 561, 573–74, 93 L.Ed. 721, 739 (1949). The Court has stated, "But, so far as concerns private persons claiming immunity for their ordinary business operations (even though in connection with governmental activities), no implied constitutional immunity can rest on the merely hypothetical interferences with governmental functions . . . ." *Id.* at 365, 69 S.Ct. at 573, 93 L.Ed. at 739.

■ Similarly, we conclude that KIC is not constitutionally immune from the assessed ad valorem property taxes under the doctrine of federal instrumentalities because the interference with KIC's alleged provision of governmental services caused by the taxes simply is not substantial enough.

### III. CONCLUSION

■ We conclude that the superior court erred in holding that KIC's leasehold interest is tax-exempt under 25 U.S.C. § 465 because the necessary prerequisite to such tax-exemption, that the property be held by the United States in trust for the tribe, was not satisfied by KIC. We conclude that neither of the bases suggested by KIC for nonetheless affirming the judgment has merit. The ad valorem property taxes do not impermissibly impinge upon KIC's "tribal autonomy," assuming that KIC is an Indian tribe and that the economic burden of the taxes will fall upon it, because the Borough's interest in generating the revenue from the non-discriminatory tax to pay for services provided to the property exceeds KIC's interest in retaining the revenue to provide governmental programs to its members. Finally, the taxes cannot be held impermissible under the "federal instrumentality doctrine" because the United States Supreme Court has specifically rejected the current application of that doctrine to immunize Indians from state taxation.

The judgment of the superior court is therefore REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

CONNOR, J., not participating.

RABINOWITZ, Justice, concurring.

I agree with Part II(A) of the court's opinion that the property leased by KIC is not exempt from the Ketchikan ad valorem taxes under 25 U.S.C. § 465, and with Part II(C), that the property is not exempt from taxation as a federal instrumentality. I join also in the result reached in Part II(B), that KIC is not immune from local taxation as a sovereign entity, although I would ground this holding on the conclusion that KIC is not an Indian tribe and enjoys no sovereign immunity.

A Native entity asserting sovereign immunity shoulders the burden of proving it is a tribe. *See Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 586–87 n. 6, 589 (1st Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979). Admittedly, the legal principles of tribal status are a subject of great uncertainty. *See* Felix S. Cohen's Handbook of Federal Indian Law

3–15 (1982 ed.); W.C. Canby, American Indian Law 3–6 (1981). In the absence of federal recognition[1] I would anticipate that a colorable claim of tribal sovereignty might prove exceedingly difficult to adjudicate. *Cf. Atkinson v. Haldane,* 569 P.2d 151, 162–63 (Alaska 1977) (federal government had recognized Metlakatla Indian Community as an Indian tribe). The instant case, however, does not present such a colorable claim.

Reviewing the criteria used in various circumstances for determining whether a Native group is to be considered a tribe, I think the KIC falls short of satisfying any extant definition. Tribal status may be established by explicit federal recognition. The state courts must respect federal determinations in this area, and recognized entities will be accorded sovereign immunity. *Atkinson,* 569 P.2d at 162–63. While the KIC has not been accorded federal recognition, this does not end all inquiry under federal standards. *Bottomly v. Passamaquoddy Tribe,* 599 F.2d 1061, 1064–65 (1st Cir.1979); *Maine v. Dana,* 404 A.2d 551, 553–54 (1979), *cert. denied,* 444 U.S. 1098, 100 S.Ct. 1064, 62 L.Ed.2d 785 (1980). It is still necessary to determine whether the KIC is the type of community which would be recognized by the federal government. *Cf. Mashpee Tribe,* 592 F.2d at 581.

In 1978, the Department of the Interior published final regulations entitled "Procedures for Establishing that an American Indian Group Exists as an Indian Tribe." *See* 25 C.F.R. Part 83, 47 Fed.Reg. 13326 et seq. (March 30, 1982).[2] 25 C.F.R. § 83.7 sets forth detailed prerequisites for federal recognition of a Native American organization as an Indian tribe. Among these are:

(b) Evidence that a substantial portion of the petitioning group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area, and that its members are descendants of an Indian tribe which historically inhabited a specific area.[3]

(c) A statement of facts which establishes that the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present.

I think it evident that the KIC falls short of satisfying the requirements set forth in

---

**1.** In its petition for rehearing the KIC asserts that "the United States specifically recognizes KIC as a tribal entity" by virtue of 47 Fed.Reg. 53130–35 (November 24, 1982). The cited notice by the Department of Interior, Bureau of Indian Affairs, expressly includes the KIC among "additional entities in Alaska which are not historical tribes." *Id.* at 53133–34. Thus, it appears that the KIC has not been recognized by the federal government as an Indian Tribe.

**2.** 25 C.F.R. Part 83, originally published in 1978 as 25 C.F.R. Part 54, was redesignated Part 83 in 1982 without substantive revision. *See* 47 Fed.Reg. 13327 (March 30, 1982). It is not clear whether the KIC is eligible to seek recognition under these regulations. The 1978 Supplementary Information to the Final Rule stated: "Groups in Alaska are entitled to petition on the same basis as groups in the lower 48 states." 43 Fed.Reg. 39361 (September 5, 1978). 25 C.F.R. § 83.3(b), however, delimits the scope of the regulations as follows:

This part does not apply to Indian tribes, organized bands ... or communities which are already recognized as such and are receiving services from the Bureau of Indian Affairs.

As of this writing it is doubtful that the KIC has been "recognized" as a tribe, band, or community. On November 24, 1982, the Bureau of Indian Affairs included the KIC in its notice of "Alaska Native Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs." 47 Fed.Reg. 53133 (November 24, 1982). This listing, however, expressly avoided characterizing Alaskan Native groups as tribes or Indian communities. Instead, the notice stated that "unique circumstances have made eligible additional entities in Alaska which are not historical tribes." *Id.* In my view recognition as an "additional entity" does not remove the KIC from eligibility under 25 C.F.R. Part 83 by virtue of 25 C.F.R. § 83.3(b).

The applicability of Part 83 to the KIC, however, is not determinative of my conclusion that the KIC has not met its burden of demonstrating that it is a tribe. For the purposes of this opinion, I think it sufficient to cite the regulations as illustrative of the considerations that go into federal recognition.

**3.** In *Atkinson v. Haldane,* 569 P.2d 151, 156 (Alaska 1977), we noted the importance of the existence of a reservation in determining tribal status.

the federal guidelines. The members of the KIC are not descended from any particular Indian community, but are natives of differing groups who happen to live in Ketchikan. They do not inhabit a specific area which could be viewed as American Indian or as distinct from other communities. The federal regulations also require that "the petitioner has been identified from historical times until the present on a substantially continuous basis, as 'American Indian,' or 'aboriginal.'" 25 C.F.R. § 83.7(a). The KIC was formed pursuant to a 1934 statute.[4]

Theoretically distinct from arguments centering upon the actions or policy of the federal government, an Indian group may also seek to establish as a matter of historical fact that it has and continues to exist as an independent sovereign entity entitled to immunity.[5] In the earliest days of Indian law adjudication, the United States Supreme Court turned to historical analysis in evaluating the rights and powers of Indian nations.[6]

On the basis of the record before us it could not be said that the KIC has ever functioned as an independent nation. Because there is a total lack of showing by the KIC that it ever possessed the attributes of sovereignty necessary to suggest existence as a "domestic dependent nation," I would

4. Another set of federal criteria for recognition of tribes has been generated under section 16 of the Indian Reorganization Act, 25 U.S.C. § 476. *See* Felix Cohen's Handbook of Federal Indian Law 13 (1982 ed.). Similar to the requirements set forth in 25 C.F.R. Part 83, the Department of Interior has looked to the history of the tribe's relation to the United States government, the tribe's exercise of political authority over its members, and the "social solidarity" of the group. *Id.*

5. State relationships with the Indian tribes have sometimes been analyzed under the simple principle that the state police power does not extend over distinct sovereign entities. An alternative analysis, parallel to some extent, is that the federal government enjoys exclusive power to conduct Indian affairs. *See McLanahan v. Tax Comm'n of Ariz.,* 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129, 135 (1973) ("the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance upon federal pre-emption"), *citing Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). *McLanahan,* however, recognized the continuing vitality of a historical sovereignty principle: "[I]t would vastly oversimplify the problem to say that nothing remains of the notion that reservation Indians are a separate people to whom state jurisdiction, and therefore state tax legislation, may not extend." 411 U.S. at 170, 93 S.Ct. at 1261, 36 L.Ed.2d at 134. *See Warren Trading Post Co. v. Ariz. Tax Comm'n,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). *See also* F. Cohen, *Indian Rights and the Federal Courts,* 24 Minn.L.Rev. 145, 147 (1940) ("The right of self-government is not something granted to the Indians by any act of Congress. It is rather an inherent and original right of the Indian tribes, recognized by courts and legislators, a right of

which the Indian tribes never have been deprived").

6. In *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25, 31 (1831), Chief Justice John Marshall characterized the Indian tribes as "domestic dependent nations"—independent political societies whose sovereignty pre-dated the westward territorial expansion of the United States:

So much of the argument as was intended to prove the character of the Cherokees as a State, as a distinct political society separated from others, capable of managing its own affairs and governing itself, has, in the opinion of a majority of the judges, been completely successful. They have been uniformly treated as a State from the settlement of our country. The numerous treaties made with them by the United States recognize them as a people capable of maintaining the relations of peace and war, of being responsible in their political character for any violation of their engagements, or for any aggression committed on the citizens of the United States by any individual of their community. Laws have been enacted in the spirit of these treaties. The acts of our government plainly recognize the Cherokee Nation as a State, and the courts are bound by those acts. 30 U.S. (5 Pet.) at 16, 8 L.Ed. at 30. *See also Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 560–61, 8 L.Ed. 483, 501 (1832). The Court's historical perspective of the relationship of the Indian nations to state and federal governments has survived into modern times. In *McLanahan v. Tax Comm'n of Ariz.,* 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129, 136 (1973), the Court cautioned that "[i]t must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government."

reject any argument based upon historical fact that this court is bound to afford the KIC sovereign immunity. Because of my conclusion in this regard I can agree to the result obtained in Part II(B) of the majority opinion, although I do not join in the court's application of federal precedent.

The approach taken by the court in Part II(B) in hypothesizing the existence of a KIC "tribe" attempts to apply the "infringement" test of *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251, 254 (1959), in a setting too divorced from reality to permit meaningful application. The *Williams* test, as explained in *McClanahan v. Tax Commission of Arizona,* 411 U.S. 164, 179, 93 S.Ct. 1257, 1266, 36 L.Ed.2d 129, 140 (1973), "was designed to resolve [the] conflict [between State and tribal jurisdiction] by providing that the State could protect its interest up to the point where tribal self-government would be affected." The problem here is that, as far as the record shows, the KIC does not operate as a government. Thus, I view it as an unproductive undertaking, and one which necessarily distorts the import of federal law, to attempt to determine whether the services provided at the community center are to be considered part of KIC's governmental function.