**KETCHIKAN GATEWAY BOROUGH and Ketchikan Gateway Borough Board of Equalization, Appellants,**

v.

**KETCHIKAN INDIAN CORPORATION, Appellee.**

No. S–10332.

Supreme Court of Alaska.

Aug. 15, 2003.

Scott A. Brandt–Erichsen, Borough Attorney, Ketchikan, for Appellants.

Jahna M. Lindemuth, Dorsey & Whitney LLP, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

The superior court applied the implied federal preemption doctrine to exempt from borough taxes all space in a building that contains a tribally operated clinic that is subject to detailed oversight by the Indian Health Service. The narrow question presented here is whether space in the building that is not committed to use by the clinic should be exempt. We answer in the negative because such space is not necessarily part of a pervasively and comprehensively regulated federal program and the borough's interest in taxing the property is not inconsequential.

## I. FACTS AND PROCEEDINGS

In 1997 the United States conveyed a three-quarter-acre parcel located in Ketchikan to the Ketchikan Indian Corporation (KIC). KIC began to construct a five-story building that, when completed, was intended primarily to contain a clinic run by KIC but funded by the Indian Health Service. As of the tax day, January 1, 2000, the building was more than half complete.

KIC requested a tax exemption for the property from the Ketchikan Gateway Borough. The borough assessor initially granted a ten percent charitable exemption. He determined that ten percent of the services offered by KIC were available to the community at large and not restricted to Alaska Natives. KIC appealed to the Borough Board of Equalization. At a hearing before the board the assessor modified his position. He continued to adhere to the theory that the building could have a ten percent charitable exemption, but added that another fifty

percent could be exempt as space committed to clinic use.[1] The sixty percent exemption, based on an appraised value of the land and partially completed building as of January 1, 2000, of $2,360,300, resulted in a taxable value of $944,100. The board accepted the assessor's position but made no specific findings.

The evidence presented to the board concerning the amount of space in the building that was not committed to clinic purposes was both sparse and conflicting. KIC's zoning permit application indicated that two floors would be used for the clinic, one floor would be used for offices, and two floors would be "lease space." The plans of the building indicate two floors of clinic space, one floor of office space, one floor of lease space, and one floor of daycare space. But it is unclear whether the zoning application or the plans reflected the intent of KIC as of January 1, 2000, regarding the use of the building. At the board hearing KIC's attorney argued that all of the floor space that "is being used, is being used for hospital purposes." But he acknowledged that there were unused spaces and that "[t]he intent of KIC for the unused space is still unknown," although "long-term plans and strategy includes expansion of their hospital functions into those unused spaces." KIC's general manager acknowledged that there is space in the building which might either be leased or used for other programs of KIC. He stated that KIC would be obligated to devote lease revenues to Indian Health Services programs, but later stated that lease revenues could be used to pay the debt service on the building.

KIC paid under protest the resulting taxes, $12,462.12, both appealing the board's decision and filing a separate suit seeking a tax refund. The borough cross-appealed the board's decision, arguing that the exemption should only have been ten percent rather than sixty percent, and filed a counterclaim seeking a declaration that the clinic is not a

1. The assessor testified that the third and fourth floors and some common areas were for clinic use.

nonprofit hospital. The superior court consolidated the cases.

Following briefing and argument, the superior court

(1) dismissed the cross-appeal on the grounds that the borough lacked standing and, alternatively, that the borough was precluded from appealing from a decision that adopted the assessor's position in its entirety;

(2) held that the property was entirely exempt because of implied federal preemption, based on *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*; [2]

(3) awarded full fees of $62,694.70 and costs to KIC under AS 29.45.500(a); and

(4) ruled that its earlier decision dismissing the borough's cross-appeal in effect dismissed the borough's counterclaim.

On appeal, the borough challenges the superior court's decision on the merits only to the extent that it exempted portions of the building that were not committed for use as part of the clinic. The borough also challenges the award of full attorney's fees.

## II. STANDARD OF REVIEW AND GENERAL PRINCIPLES RELEVANT TO TAX EXEMPTION CASES

The main question involved in this case is one of law in which "we apply our independent judgment and adopt the rule of law that is most persuasive in light of precedent, reason, and policy." [3]

Taxpayer exemptions are strictly construed against the taxpayer and in favor of the taxing authority. [4] The burden of proving eligibility for an exemption is on the taxpayer. [5] The policy underlying the rule of strict construction and the burden of proof is:

> All property is benefited by the security and protection furnished by the State, and it is only just and equitable that expenses incurred in the operation and maintenance of government should be fairly apportioned upon the property of all. [6]

Notwithstanding the rule of strict construction, where the question is whether federal law requires the exemption of tribal interests from taxation, ambiguities in federal law should be resolved in favor of the tribe. [7]

Boards of equalization may spatially apportion exempt from nonexempt uses of a building and tax the nonexempt space. In all contested cases boards of equalization are required to make findings of fact sufficient to explain the reasons for their decisions. [8] Such findings are reviewed deferentially and will be affirmed if they are supported by substantial evidence. [9]

## III. DISCUSSION[10]

### A. Space in the Building that Has Not Been Committed for Use by the Clinic Is Not Exempt under the Implied Federal Preemption Doctrine.

The superior court concluded that the implied federal preemption doctrine as

---

**2.** 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982).

**3.** *State, Dep't of Transp. & Pub. Facilities v. Sanders*, 944 P.2d 453, 456 (Alaska 1997).

**4.** *Sisters of Providence in Washington, Inc. v. Mun. of Anchorage*, 672 P.2d 446, 447 (Alaska 1983).

**5.** *City of Nome v. Catholic Bishop of N. Alaska*, 707 P.2d 870, 877 (Alaska 1985).

**6.** *Id.* at 879 (quoting *Animal Rescue League v. Bourne's Assessors*, 310 Mass. 330, 37 N.E.2d 1019, 1021 (1941)).

**7.** *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 177, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989).

**8.** *City of Nome*, 707 P.2d at 875.

**9.** *Balough v. Fairbanks North Star Borough*, 995 P.2d 245, 254 (Alaska 2000).

**10.** KIC contends that this appeal is untimely. We conclude to the contrary, because the notice of appeal was filed before the court ruled that the borough's counterclaim was dismissed. The counterclaim sought declaratory relief and thus was not subject to the year-specific procedural defenses on which the dismissal of the borough's cross-appeal was based. The prematurity of a notice of appeal may be ignored where no harm is done, and that is the case here. *Garrison v. Dixon*, 19 P.3d 1229, 1232 (Alaska 2001).

reflected in the 1982 decision of the United States Supreme Court in *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*[11] applied to the property in question and resulted in its total exemption from borough taxation. Implied federal preemption in Indian tax cases is distinct from federal preemption in other areas of the law. The law of federal preemption generally requires that one "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."[12]

To determine whether Congress has preempted state action in a particular arena ... [g]enerally, we apply a two-step analysis to preemption questions. First, we look to see whether Congress has overtly preempted the subject matter the state wishes to regulate, either explicitly, by declaring its intent to preempt all state authority, or implicitly, by occupying the entire field of regulation on the subject in question. *See Webster*, 621 P.2d at 897–98. Second, if neither kind of direct preemption is found, we look to whether federal and state law conflict in this particular instance. If state and federal regulations openly conflict or if state regulations obstruct the purpose of federal regulations, then the supremacy clause blocks the state regulation. *See id.* at 897, 900–01; *Bald [v. RCA Alascom*, 569 P.2d 1328, 1331 (Alaska 1977) ].[13]

■ In contrast, questions of implied federal preemption in Indian tax cases "are not resolved by reference to standards of preemption that have developed in other areas of the law" and are "not limited to cases in which Congress has expressly—as compared to impliedly—pre-empted the state activity."[14]

Instead, we have applied a flexible preemption analysis sensitive to the particular facts and legislation involved. Each case "requires a particularized examination of the relevant state, federal, and tribal interests." *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 838, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982).[15]

*Ramah* involved the application of New Mexico's gross receipts tax to receipts that a non-Indian construction firm received from a tribal school board for the construction of a school for Indian children on a reservation. The Supreme Court held that federal law impliedly preempted application of the tax, following a methodology established in *White Mountain Apache Tribe v. Bracker*,[16] requiring "a particularized examination of the relevant state, federal, and tribal interests."[17] The Court noted the federal policy of encouraging tribal control of education and explained in detail the "comprehensive and pervasive" regulatory system pertaining to the construction and financing of Indian schools.[18] By contrast, the *Ramah* Court found that the state's interest in the tax was inconsequential. Noting the historical fact that the state had closed the only public school near the reservation, the Court stated:

[T]he State does not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying this tax. Having declined to take any responsibility for the education of these Indian children, the State is precluded from imposing an additional burden on the comprehensive federal scheme intended to provide this education—a scheme which has "left the State with no duties or

11. 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982).

12. *Webster v. Bechtel, Inc.*, 621 P.2d 890, 898 (Alaska 1980) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

13. *Tlingit–Haida Reg'l Elec. Auth. v. State*, 15 P.3d 754, 766–67 (Alaska 2001).

14. *Cotton Petroleum*, 490 U.S. at 176–77, 109 S.Ct. 1698.

15. *Id.* at 176, 109 S.Ct. 1698.

16. 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

17. *Ramah*, 458 U.S. at 838, 102 S.Ct. 3394.

18. *Id.* at 839–41, 102 S.Ct. 3394.

responsibilities." [19]

The Court also observed that the "case would be different if the State were actively seeking tax revenues for the purpose of constructing, or assisting in the effort to provide, adequate educational facilities for Ramah Navajo children." [20]

The other United States Supreme Court case finding an implied federal preemption is *Bracker*.[21] It has in common with *Ramah* the twin factors of a comprehensive and pervasively regulated activity concerning tribal interests and an inconsequential state taxing interest. In *Cotton Petroleum Corp.* the United States Supreme Court summarized *Bracker* as follows:

> In *Bracker*, we addressed the question whether Arizona could impose its motor carrier license and use fuel taxes on a nonmember logging company's use of roads located solely within an Indian reservation. Significantly, the roads at issue were "built, maintained, and policed exclusively by the Federal Government, the Tribe, and its contractors," 448 U.S. at 150 [100 S.Ct. 2578], and the State was "unable to identify any regulatory function or service [it] performed ... that would justify the assessment of taxes for activities on Bureau and tribal roads within the reservation," *id.*, at 148–149 [100 S.Ct. 2578]. *See also id.*, at 174 [100 S.Ct. 2599, 65 L.Ed.2d 684] (Powell, J., concurring) ("The State has no interest in raising revenues from the use of Indian roads that cost it nothing and over which it exercises no control."). Moreover, it was undisputed in *Bracker* that the economic burden of the taxes ultimately fell on the Tribe. *Id.*, at

151 [100 S.Ct. 2578]. Based on these facts and on our conclusion that collection of the taxes would undermine federal policy "in a context in which the Federal Government has undertaken to regulate the most minute details" of the Tribe's timber operations, we held that the taxes were preempted. *Id.*, at 149 [100 S.Ct. 2578].[22]

In *Board of Equalization for the Borough of Ketchikan v. Alaska Native Brotherhood & Sisterhood, Camp No. 14*, we had occasion to rule on the application of the implied federal preemption doctrine to municipal real estate taxes.[23] At issue was the taxability of a federally funded building built by KIC and held by it under a long-term lease. KIC conducted "various cultural, educational, vocational, health and community service programs" in the building.[24] We observed that the tax revenues "will be used to provide police and fire protection to the premises, as well as to provide water, electrical and sewer services to the building.... Ketchikan has a strong interest in raising these revenues by taxing the property because they are for services that must be provided to the property." [25] We concluded that the borough taxes were not preempted in light of the services that the borough was providing:

> [W]e conclude that our analysis is in complete accordance with *Ramah*. In that case, the Supreme Court struck down a state gross receipts tax imposed on a non-Indian subcontractor of a school building constructed for the Navajo tribe on their reservation. The Court held that the tax was implicitly preempted by the comprehensive federal regulatory scheme govern-

---

19. *Id.* at 843, 102 S.Ct. 3394 (quoting *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 691, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965)).

20. *Id.* at 844 n. 7, 102 S.Ct. 3394.

21. 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

22. 490 U.S. at 184, 109 S.Ct. 1698. We note that the Ninth Circuit takes the position that the *Bracker* implied preemption doctrine does not apply outside of Indian country. *Malabed v. North Slope Borough*, 335 F.3d 864 (9th Cir. 2003) ("[T]he Supreme Court has unmistakably

held that nondiscriminatory state laws that apply to Native Americans outside of Indian country may be preempted only by an 'express federal law to the contrary,' not by a generalized federal policy. *White Mtn. Apache Tribe v. Bracker*, 448 U.S. 136, 144 n. 11, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)."). 335 F.3d 864, 872. *See also Blunk v. Arizona Dep't of Transp.*, 177 F.3d 879, 882–84 (9th Cir.1999) ("*White Mountain* balancing test" does not apply outside of Indian country).

23. 666 P.2d 1015, 1022 n. 5 (Alaska 1983).

24. *Id.* at 1017.

25. *Id.* at 1022.

ing the construction of autonomous Indian educational facilities. The Court noted that the tax served only to generate revenue for the state, which was not providing any correlative services to the tribe. The Court's opinion specifically indicates: "In this case, the State does not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying this tax." [458 U.S. at 843, 102 S.Ct. 3394.]

In the case before us, however, the taxes assessed by Ketchikan are in return for the governmental functions it provides to the property leased by KIC. Accordingly, the tax is not impermissible, nor is it preempted by federal regulations because it is apparent that when the "relevant state, federal, and tribal interests," *Ramah*, 458 U.S. at [838, 102 S.Ct. 3394], are examined and balanced, Ketchikan's assertion of taxing authority is reasonable.[26]

■ In the present case, in our view the space in the building that is not used or committed to use as part of the clinic cannot be considered as exempted from borough taxation under the implied federal preemption doctrine. One essential feature of the doctrine is that the activities in question must be subject to comprehensive and pervasive federal oversight. While the operation of the clinic may well be subject to such oversight, the same cannot be said concerning the uncommitted space. Since as of the tax date it was uncertain how the uncommitted space would be used, the space cannot be considered to be part of any particular program, much less one which is pervasively regulated.[27]

We also believe that the second element of the implied federal preemption cases—relatively inconsequential state interest—is missing in this case. Our observations in *Board of Equalization* concerning the substantial services that the borough afforded to the building and the tribe are as applicable now as they were in that case.[28]

Accordingly, it seems clear that the uncommitted space is not entitled to a tax exemption.[29] But there is much uncertainty in the record before us as to how much space was uncommitted as of January 1, 2000. The board made no findings on this or any other subject, and the parties' presentations on this point were vague and unfocused. A remand for a new hearing before the board will be necessary in order to determine an appropriate spatial apportionment. The board should make written findings supporting its determination.

### B. Costs and Attorney's Fees.

■ Because we are remanding for a new hearing to determine the appropriate spatial apportionment between clinic and non-clinic use, it is no longer certain that KIC will

**26.** *Id.* at 1022 n. 5.

**27.** In *Dist. of Columbia v. Catholic Univ. of Am.*, 397 A.2d 915, 921–22 (D.C.1979); *Our Savior Lutheran Church v. Dep't of Revenue*, 204 Ill. App.3d 1055, 150 Ill.Dec. 395, 562 N.E.2d 1198, 1201 (1990); and *United Way of the Midlands v. Douglas County Bd. of Equalization*, 215 Neb. 1, 337 N.W.2d 103, 107 (1983), all cited in footnote 18 of the dissenting opinion, the unused space, when used, was intended to be used for tax-exempt purposes. By contrast, in the present case it is unknown how the unused space will be used, but it appears that at least for near-term purposes it will either be leased to others or used for other programs of KIC. *See supra* page 1044.

**28.** *See Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), where the Court declined to apply the *Ramah/Bracker* implied preemption approach to a state severance tax on oil produced by non-Indians on a reservation. One of the reasons given for this conclusion was that the state provided substantial services to the tribe and to the oil producer, whereas *Ramah* and *Bracker* "involved complete abdication or noninvolvement of the State in the on-reservation activity." *Cotton Petroleum Corp.*, 490 U.S. at 185, 109 S.Ct. 1698.

**29.** Following a New Mexico Court of Appeals case, *Ramah Navajo Sch. Bd., Inc. v. New Mexico Taxation & Revenue Dep't*, 127 N.M. 101, 977 P.2d 1021 (N.M.App.1999), *cert denied*, 127 N.M. 389, 981 P.2d 1207 (1999), *cert denied*, 528 U.S. 928, 120 S.Ct. 322, 323, 145 L.Ed.2d 252 (1999), the superior court found that the borough taxes were also preempted under the "general preemption doctrine." However, as Congress has not overtly preempted the tax, and because state and federal laws do not conflict in this area, the borough is not barred by federal preemption from taxing the space in the building not dedicated to use by the clinic. *See Tlingit–Haida Reg'l Elec. Auth. v. State*, 15 P.3d 754, 766–67 (Alaska 2001).

prevail. We therefore vacate the superior court's grant to KIC of full reasonable costs and attorney's fees. If it prevails on remand, however, KIC will be entitled to full reasonable costs and attorney's fees under AS 29.45.500(a) and Ketchikan Gateway Borough Code § 45.13.110.[30]

## IV. CONCLUSION

We REVERSE the superior court's holding that space in the building not committed to use by the clinic is exempt from borough taxes and REMAND to the board for a new hearing to determine the appropriate spatial apportionment between clinic and non-clinic areas. In light of this remand, we VACATE the superior court's award of costs and attorney's fees to KIC.

FABE, Chief Justice, with whom CARPENETI, Justice, joins, dissenting.

FABE, Chief Justice, with whom CARPENETI, Justice, joins, dissenting.

I disagree with the court's conclusion that the uncommitted space in KIC's building is not exempt from borough taxes. In my view, KIC has presented a sufficiently strong federal and tribal interest to allow extension of its tax exemption to temporarily unused spaces.

As the court's opinion recognizes, the United States Supreme Court held in *Ramah* that questions of implied federal preemption in Indian tax cases require "a particularized examination of the relevant state, federal, and tribal interests."[1] Informing the preemption analysis are "the traditional notions of tribal sovereignty, and the recognition and encouragement of this sovereignty in congressional Acts promoting tribal independence and economic development[.]"[2] Relevant federal statutes, therefore, "must be examined in light of 'the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence.'"[3]

Consideration of the federal and tribal interests is the first step of the balancing required by implied federal preemption analysis. The court's opinion concludes that there is no weight at all on this half of the scale because there is not a comprehensive and pervasive federal program dealing with unused spaces. But I believe that the court has unduly narrowed the scope of inquiry. The proper question is whether an Indian tribe that is operating a health care facility under the aegis of the Indian Self–Determination and Education Assistance Act (ISDEAA)[4] can be granted reasonable flexibility in extending its tax exemption to temporarily unused spaces in the building— a situation not uncommon in such facilities.

Looking at this broader question, the federal and tribal interests are clear and strong. Provision of Indian health care services is comprehensively and pervasively regulated; this is manifest both in the ISDEAA and in the Indian Health Care Improvement Act (IHCIA).[5] Congress expressed its intention in the ISDEAA that those operating under self-determination contracts receive the same amount of funding as would the federal government if one of its departments was still providing the services in question.[6] In *Ra-*

**30.** *See Kenai Peninsula Borough v. Port Graham Corp.,* 871 P.2d 1135 (Alaska 1994); *Kenai Peninsula Borough v. Cook Inlet Region, Inc.,* 807 P.2d 487 (Alaska 1991).

**1.** Op. at 1046; *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of N.M.,* 458 U.S. 832, 838, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982).

**2.** *Ramah,* 458 U.S. at 838, 102 S.Ct. 3394.

**3.** *Id.* (quoting *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144–45, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)).

**4.** 25 U.S.C. §§ 450–458bbb–2 (2001).

**5.** 25 U.S.C. §§ 1601–1683 (2001).

**6.** 25 U.S.C. § 450j–1(a)(1) (2001); *see also Ramah Navajo Sch. Bd., Inc. v. N.M. Taxation & Revenue Dep't,* 127 N.M. 101, 977 P.2d 1021, 1033 (N.M.App.1999), *cert. denied,* 127 N.M. 389, 981 P.2d 1207 (1999), *cert. denied,* 528 U.S. 928, 120 S.Ct. 322, 323, 145 L.Ed.2d 252 (1999) ("Congress has provided that Indian communities will not suffer financially by the transfer of services from the federal government to tribal agencies.... The Act's purpose of providing tribes with the same funding that the federal agency would receive for the same service is undercut if the State imposes a tax that makes performance of the service more expensive for the tribe than for the federal agency.").

*mah,* the Court found that the burden imposed by the state's taxation impeded "the clearly expressed federal interest in promoting the 'quality and quantity' of educational opportunities for Indians by depleting the funds available for the construction of Indian schools." [7] Local taxes on unused spaces could similarly impede the federal interest in promoting Indian health care by reducing the funds available to Indian tribes that have clinic buildings with unoccupied space.[8]

KIC's counsel argued at the board hearing that "[t]he intent of KIC for the unused space is still unknown, although there [are] long term plans and strateg[ies that] include[ ] expansion of their hospital functions into those unused spaces." Allowing KIC the flexibility to maintain tax-exempt open space for expansion or reorganization of health services comports with the federal policy of encouraging tribal sovereignty and promoting tribal independence and economic development.

The state interests constitute the other half of the balancing analysis. In *Ramah,* the state interest was merely the collection of revenue; the state provided no services to the school being constructed on the reservation.[9] The Court determined that this was insufficient to justify the burdens imposed by the tax.[10] Here, KGB is providing governmental functions to the KIC building. The opinion accurately compares this provision of services to those in *Board of Equalization*

*for the Borough of Ketchikan v. Alaska Native Brotherhood & Sisterhood, Camp No. 14,* in which we upheld the Borough's taxing authority.[11] The federal and tribal interests in that case, however, were different. There, we only examined whether KIC was exempt from ad valorem taxes under the Indian Reorganization Act,[12] under a theory of tribal sovereignty,[13] or under a theory of federal instrumentality.[14] We concluded that none of these theories had merit,[15] in part "because the Borough's interest in generating the revenue from the non-discriminatory tax to pay for services provided to the property exceeds KIC's interest in retaining the revenue to provide governmental programs to its members." [16]

Here, in contrast, we are addressing clearer and stronger federal and tribal interests as expressed in the ISDEAA and IHCIA, as well as the explicit congressional desire for Indian tribes to have the same funding that the federal government would have to provide health services. Striking the balance between these competing interests is thus more difficult than in *Board of Equalization.* Given the congressional desire for Indian tribes to have equal funding, the obstacle to that goal that could be presented by allowing Borough taxation of unused spaces in a health care facility, and the policy expressed in *Cotton Petroleum Corp.* that ambiguities concerning the exemption of tribal interests from taxation should be resolved in favor of the tribe,[17] I would conclude that the balance

7. *Ramah,* 458 U.S. at 842, 102 S.Ct. 3394.

8. Imposing the tax in this case will result in KIC having $12,462.12 less to provide medical services. This effect does not seem compatible with Congress's intent, in enacting the ISDEAA, to see that those operating under self-determination contracts would receive the same amount of funding as would the federal government if one of its departments was still providing the services in question. In addition, imposing a tax on KIC for space that it could have decided to use in the future for clinic space may well foreclose that possibility by creating a present need to generate revenue from the space. This effect seems contrary to the federal interest, evident in the IHCIA, in promoting Indian health care. *See, e.g.,* 25 U.S.C. § 1601(b) (2001) ("A major national goal of the United States is to provide the quantity and quality of health services which will permit the health status of Indians to be raised to the highest possible level and to encourage the

maximum participation of Indians in the planning and management of those services.").

9. *Ramah,* 458 U.S. at 843, 845, 102 S.Ct. 3394.

10. *Id.* at 845, 102 S.Ct. 3394.

11. 666 P.2d 1015 (Alaska 1983).

12. 25 U.S.C. § 465 (2001); 666 P.2d at 1018.

13. 666 P.2d at 1019.

14. *Id.* at 1022.

15. *Id.* at 1023.

16. *Id.*

17. *Cotton Petroleum Corp. v. New Mexico,* 490 U.S. 163, 177, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989).

tips in favor of the federal and tribal interests—and thus exemption.

KIC should be granted the flexibility to maintain some unused space in its health services building without sacrificing its tax-exempt status for those spaces.[18] Accordingly, I would affirm the superior court's decision. I therefore respectfully dissent from the court's opinion.

---

18. Cf. Dist. of Columbia v. Catholic Univ. of Am., 397 A.2d 915, 921–22 (D.C.1979) ("A school the size of Catholic University must have some flexibility in its operation and its exempt status should not be disturbed merely because it elects, for a given period, not to use a given classroom, or portion of a dormitory, or other building...."); Our Savior Lutheran Church v. Dep't of Revenue, 204 Ill.App.3d 1055, 150 Ill.Dec. 395, 562 N.E.2d 1198, 1201 (1990) ("We do not think that mere temporary vacancy or lack of use of a portion of an otherwise exempt parcel of property renders that portion taxable. To hold that when a portion of a building otherwise used for an exempt purpose becomes temporarily vacant or unused it loses its exempt status is nonsensical and impractical of application."); United Way of the Midlands v. Douglas County Bd. of Equalization, 215 Neb. 1, 337 N.W.2d 103, 107 (1983) ("The facts here are similar to the not unusual situation of unused rooms in a charitable hospital or in the dormitory of an educational institution. Oftentimes a qualified organization acquires or maintains building space in reasonable anticipation of full occupancy for an exempt purpose but cannot do so because of economic conditions or other legitimate reasons.").